797 F.2d 1210
 DERRY FINANCE N.V., a Netherlands Antilles Corporation and
C.F.S. Planning Corporation and Richard Klein,
Residents of California
v.
The CHRISTIANA COMPANIES, INC., A Delaware corporation, and
AARK Enterprises, Inc., a Delaware Corporation,
and AARK Enterprises, a New York partnership.
Appeal of DERRY FINANCE N.V.
 No. 85-5741.
 United States Court of Appeals,
Third Circuit.
 Argued June 5, 1986.
Decided Aug. 1, 1986.
Rehearing Denied Sept. 11, 1986.
 
 Lawrence C. Ashby (argued), Stephen E. Jenkins, Ashby, McKelvie & Geddes, Wilmington, Del., Jerry J. Strochlic, Stuart A. Krause, Sage, Gray, Todd & Sims, New York City, for appellant.
 Jerome Wiener (argued), David J. Lester, Antonow & Fink, Chicago, Ill., William J. Wade, Richards, Layton & Finger, Wilmington, Del., for appellee.
 Before GIBBONS, BECKER and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 Derry Finance N.V. (Derry) appeals a partial summary judgment in favor of the Christiana Companies, Inc. (Christiana) in its suit for nonpayment of six recourse promissory notes. (Christiana recourse notes). The district court held that Christiana, the maker of the notes, was relieved from liability by operation of a restrictive provision in those notes. On appeal Derry argues that the district court erred in its holding that the restrictive provision applied, and, in any event, in its rejection of Derry's equitable estoppel argument. We affirm.
 
 
 2
 This dispute stems out of a complicated leveraged leaseback transaction. The principal parties to the transaction were Air Florida, Inc. (Air Florida), AIG-737-1, Inc. (AIG), AARK, and Christiana. The transaction, which was proposed by AARK, involved the sale and leaseback of two Boeing 737 aircraft. The deal essentially was structured as follows: Air Florida was to sell the planes to AIG, AIG was then to sell them to AARK, and AARK in turn was to sell them to Christiana. Christiana was then to lease the aircraft back to AIG, which would in turn sublease them to Air Florida.
 
 
 3
 The various steps in the leaseback transaction were laid out in a series of documents. The basic document was the Participation Agreement. It established the overall structure of the transaction and the obligations of the parties, and incorporated by reference the other documents evidencing it. Chief among these documents for our purposes were: 1) Sales Agreement-I between Air Florida and AIG, 2) Sales Agreement-II between AIG and AARK, 3) the AARK notes by AARK in favor of AIG, 4) Security Agreement-I between AARK, as debtor, and AIG, as secured party, 5) Sales Agreement-III between AARK and Christiana, 6) the Christiana recourse notes by Christiana in favor of AARK, 7) Security Agreement-II between Christiana, as debtor, and AARK, as secured party, 8) the Overlease Agreement between Christiana, as lessor, and AIG, as lessee, and 9) the Lease Agreement between AIG, as sublessor, and Air Florida, as sublessee. See Joint Appendix 207-10.
 
 
 4
 At closing AARK was to purchase the aircraft from AIG by making a cash payment to AIG in the amount of $2,960,000 and by delivering to AIG two nonrecourse installment notes (AARK notes), each in the amount of $10,342,500. Under the terms of the AARK notes, a portion of the cash sum was to represent the first installment on the notes. As security for its obligation, AARK was to execute a security agreement (Security Agreement-I) in favor of AIG. Security Agreement-I gave AIG certain rights upon the occurrence of an "Event of Default" under the AARK notes by reason of certain action or inaction on the part of AARK.
 
 
 5
 Christiana's obligations at closing were to purchase the aircraft from AARK and to lease them, pursuant to the Overlease Agreement, to AIG. Christiana was to pay for the planes by delivering to AARK $950,000 in cash, the six Christiana recourse notes, the first two of which were due on July 15, 1981, and a nonrecourse promissory note. The six Christiana recourse notes, which are the subject matter of this appeal, contain the following exculpatory clause:
 
 
 6
 Payor [Christiana] and Payee [AARK] among others are parties to a certain Participation Agreement ... ("Participation Agreement"). Anything herein to the contrary notwithstanding, payor shall not have any obligation to pay this note nor shall payor have any liability hereunder if, on the maturity date of this note, a default exists under the Participation Agreement or any note, lease, agreement or document contemplated therein, including, without limitation, the Loan Certificates, the Lease and the Overlease (as those terms are defined in the "Participation Agreement.").
 
 
 7
 Joint Appendix at 536.
 
 
 8
 The transaction closed on December 31, 1979. At that time AARK failed to pay the first installment on the notes, which amounted to approximately $600,000. In May of 1981 AARK assigned the Christiana recourse notes to Derry in exchange for a multi-million dollar line of credit. On July 15, 1981, the maturity date on the first two Christiana recourse notes, AARK still owed AIG $505,500 out of the $600,000 it failed to pay at closing. In addition, as of July 15, 1981, AIG, as lessee, had failed to make many of the rental payments due Christiana, as lessor, under the Overlease Agreement. In fact from the closing date until February of 1981 AIG made no payments at all. At some point AARK stepped in and paid AIG's rent from the period running from January 15, 1980 through January 15, 1981. No further payments, however, were made until early July 1981. At that time Christiana rejected attempted payments by AARK and AIG. Christiana then refused to make payment on the two recourse notes when they came due. The remaining notes were promptly accelerated.
 
 
 9
 Derry, the holder of the notes, instituted this suit in federal court on June 28, 1982, seeking to hold Christiana liable on the six notes. On cross-motions for summary judgment, the district court held in favor of Christiana on the ground that AARK's failure to pay the appropriate cash sum at closing constituted a default within the meaning of the restrictive clause in the Christiana recourse notes thereby relieving Christiana of all liability. See Derry Finance N.V. v. Christiana Companies, Inc., 616 F.Supp. 544 (D.Del.1985).
 
 
 10
 The pivotal issue on this appeal is the proper interpretation of the exculpatory clause in the Christiana recourse notes stating that Christiana is relieved of liability if "a default exists under" certain referenced documents. In this case, although they advocate conflicting interpretations of the clause, both Derry and Christiana contend that the clause is unambiguous. Under New York law, which controls this case, the construction of plain and unambiguous language is for the court. See Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 396 N.E.2d. 1029, 421 N.Y.S.2d 556 (1979); West, Weir & Bartel, Inc. v. Mary Carter Paint Co., 25 N.Y.2d 535, 255 N.E.2d 709, 307 N.Y.S.2d 449 (1969), remittitur amended, 26 N.Y.2d 969, 259 N.E.2d 483, 311 N.Y.S.2d 13 (1970). When the intent of the parties can be gleaned from the documents themselves, the court will not consider extrinsic evidence, but will give effect to the parties' intent as evidenced by the language they used. See Slatt v. Slatt, 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 488 N.Y.S.2d 645 (1985).
 
 
 11
 Derry argues, as it did in the district court, that the unequivocal meaning of the clause is that Christiana is relieved of liability only in the event that a default occurs under the terms of the referenced documents. In other words, it argues that the parties intended that the referenced documents give meaning and content to the word default; they did not intend for it to have any independent meaning. Applying this rationale, Derry argues that a default did not occur under the AARK notes and Security Agreement-I when AARK failed to pay the first installment on the notes at closing because Security Agreement-I, although not defining when a default per se occurs, states that an "Event of Default" does not occur until three conditions coincide: 1) AARK fails to perform, 2) AIG gives AARK notice of its failure to perform, and 3) a ten-day period elapses after notice is given. Because AIG never gave notice, Derry contends that no default triggering the exculpatory clause occurred. On the other hand, Christiana contends, and the district court found, that the unambiguous meaning of default is its plain meaning, failure to pay or perform, and, thus, that AARK's nonperformance constituted a default for purposes of the exculpatory clause. We conclude that Derry's argument is fatally flawed and we decline to follow it.
 
 
 12
 Several considerations compel us to reject Derry's argument that the term default incorporates the "Event of Default" provision in Security Agreement-I as the definition of default. First and foremost, the exculpatory clause cannot incorporate anything from Security Agreement-I because the word default is simply not defined in that document. Security Agreement-I and the other referenced documents speak in terms of "Events of Default," not "default."[1] Thus, Security Agreement-I only grants AIG, the party owed the performance, rights upon the occurrence of an "Event of Default." "Event of Default" is specifically defined in Security Agreement-I as the
 
 
 13
 failure of Debtor [AARK] promptly and faithfully to pay, observe and perform when due any of the Obligations [defined as making payments under the AARK note] ... and such failure shall continue for a period of ten (10) days after written notice thereof.
 
 
 14
 Joint Appendix at 516. As a comparison of these documents illustrates, there is nothing in either Security Agreement-I nor the Christiana recourse notes that leads to the conclusion that "default" is the equivalent of "Event of Default."
 
 
 15
 The obvious distinction between these terms is borne out by the fact that the word "default" in the exculpatory clause is in lower case letters whereas the term "Event of Default", which is clearly a term of art, is always capitalized. Upon a review of all the referenced documents, it becomes clear that when the parties intended to create a term of art or to incorporate specific definitions from other documents, they capitalized the referencing term and then utilized the same term in the referenced document. An example of this can be found in the relationship between Sales Agreement-II between AIG and AARK and the Lease Agreement between AIG and Air Florida. Sales Agreement-II grants AARK certain rights upon the occurrence of an "Event of Default" under the Lease. The Lease, the referenced document, specifically defines "Event of Default" using the term "Event of Default." The incorporation could not be clearer.
 
 
 16
 The difference between the meaning of the lower case "default" and the capitalized "Event of Default" is perhaps best illustrated by a provision in the Overlease Agreement between Christiana and AIG in which the parties use both terms and they obviously ascribe different meanings to them. The provision, which defines what constitutes an "Event of Default" for purposes of that agreement, states that an "Event of Default" occurs if "AIG shall default in the payment of any installment of Rent as and when the same becomes due and payable, and such default shall continue for a period of ten (10) days after written notice." Joint Appendix at 854-55 (emphasis supplied). Clearly, in this provision, the parties intended for the word default, which is written in lower case letters as it is in the exculpatory clause, to have its ordinary, plain meaning.
 
 
 17
 Finally, an examination of the purposes served by the two terms further convinces us that they are not functional equivalents and therefore that one does not incorporate the other. Under the exculpatory clause, a "default" enables Christiana to avoid liability on the recourse notes; however, under the "Event of Default" clauses in the other documents, the occurrence of an "Event of Default" automatically triggers in the party owed performance all of the rights afforded secured parties under the Uniform Commercial Code, including the right to take possession of the aircraft.[2] Thus the "Event of Default" clause gives the obligee access to equity; the default clause does not.
 
 
 18
 For the above reasons, we conclude that Derry's reading of the restrictive provision is not supported by the language of the documents. Derry's construction leads only to hopeless confusion since there is no such thing as a "default" within the meaning of Security Agreement-I and the AARK notes. A "default" is simply not the same thing as an "Event of Default." Therefore there can be no incorporation. The intention of the parties is plain on the face of the documents: The word default means failure to perform.
 
 
 19
 Derry contends, however, that even if default is given its plain meaning, no default occurred for purposes of the exculpatory clause because AARK and AIG entered into a separate, oral agreement deferring AARK's obligation under the AARK notes to pay the first installment until some time after closing when AARK could discount the Christiana notes. The district court rejected this argument and we do too. When drafted, Christiana and AARK agreed that Christiana would be relieved of liability on the notes if, inter alia, AARK failed to perform its obligation to pay a certain cash sum to AIG at closing. This agreement cannot be modified or changed without the consent of Christiana. See, e.g., Beacon Terminal Corp. v. Chemprene, Inc., 75 A.D.2d 350, 429 N.Y.S.2d 715 (N.Y.App.Div.1980) (modification requires mutual assent); Lundberg v. Board of Education of Gloversville Enlarged School District, 127 Misc.2d 804, 487 N.Y.S.2d 306 (N.Y.Sup.Ct.1985) (unilateral modification not binding on other party). Derry points to no agreement, written or oral, to which Christiana was a party that modifies the Christiana notes. Therefore the plain meaning of the notes controls, and AIG's and AARK's alleged oral modification has no bearing on Christiana's rights under the exculpatory clause in the recourse notes.
 
 
 20
 Finally, Derry contends that in any event Christiana is liable on the notes because Christiana is estopped from raising the exculpatory clause as a defense.[3] Derry's estoppel argument is based on a conversation that a Mr. D.W.H. McCowan, one of the principals of Derry, had with a Mr. George Weymouth, who was a close personal friend of Mr. Martin Fenton, the president of Christiana. The conversation took place before Derry purchased the notes. McCowan asked Weymouth whether it was his understanding that Christiana would pay the notes when due. Weymouth spoke with Fenton and Fenton assured Weymouth that Christiana intended to pay them. At the time Fenton made this representation to Weymouth, Fenton was aware that Weymouth was inquiring on behalf of someone in Bermuda who was interested in purchasing the notes and on his own family's behalf, which was considering the purchase of a participation in the notes. Weymouth conveyed Fenton's response to McCowan. McCowan resides in Bermuda.
 
 
 21
 The district court concluded, after drawing all reasonable inferences in Derry's favor, that Derry failed to satisfy the elements necessary for the application of the equitable estoppel doctrine. We agree with the conclusion of the district court. Derry has not produced any evidence from which one could reasonably infer that Fenton intended or even imagined that a prospective purchaser of these notes would, without further inquiry, rely on this telephone conversation as Christiana's final and fixed intention. Moreover, Derry's estoppel argument requires it to show that its reliance on Fenton's statement, reported to McCowen secondhand by Weymouth, was reasonable. However, Derry has produced nothing to justify its dependence upon these remarks made by Fenton, upon a relatively informal inquiry, regarding future plans of Christiana towards obligations that had not yet matured. For these reasons, Derry's estoppel argument cannot succeed.
 
 
 22
 We hold that AARK's failure to pay the requisite cash sum to AIG at the December 1979 closing triggered the exculpatory clause in the Christiana recourse notes relieving Christiana of all liability because AARK's nonperformance constituted a default within the meaning of that clause. In addition we hold that Christiana is not estopped from raising the exculpatory clause as a defense to this suit for nonpayment. The summary judgment will therefore be affirmed.
 
 BECKER, Circuit Judge, dissenting:
 
 23
 Unlike the majority, I believe that there are genuine issues of material fact that foreclose the grant of summary judgment. Hence, I would vacate the grant of summary judgment and remand the case for trial before a jury.[1]
 
 
 24
 I. BACKGROUND: THE PLAIN MEANING INTERPRETATION
 
 
 25
 Although the case arises from a complicated transaction, the essential documents are few and the issue simply stated. We are called upon to interpret the "restrictive legend" affecting the six recourse promissory notes between Christiana and AARK. The restrictive legend provided that Christiana would be relieved of all liability on the notes if, on their maturity dates, a "default exists under" certain referenced documents.[2] The only referenced documents relevant here are (1) the AIG-AARK notes ("the notes") which established the dates on which specified sums were due AIG from AARK, and (2) the related security agreement ("the AIG-AARK security agreement," or "Security Agreement I") which (a) defined the conditions that constituted an "Event of Default," and (b) gave AIG certain remedies if such an Event of Default occurred. The only part of the "Event of Default" definition that is relevant here stated that an Event of Default occurred when (i) AARK failed to pay money in the amount and at the dates specified in the notes; (ii) AIG made a written demand for payment; and (iii) AARK still failed to pay for a period of ten days following the written demand.[3] It is undisputed that the notes incorporated the AIG-AARK security agreement by reference. See App. at 510 ("This Note is ... subject to, a security agreement ...").
 
 
 26
 The majority holds that because AARK failed to pay the specified sums to AIG on the dates identified in the AIG-AARK notes, there was, as a matter of law, a "default under" the notes and security agreement as that term ("default under") is used in the restrictive legend. The majority never explains precisely what it understands the phrase "default under [certain agreements]" to mean. Apparently, the majority believes that the phrase means simply "failure to pay sums on the dates required by those agreements."[4] I shall refer to this as the "plain meaning" interpretation. Although the plain meaning interpretation is plausible, I believe that it is not the only--or necessarily the best--interpretation of "default under" in the restrictive legend. Given the evidence on the record, at least two other interpretations are available.
 
 II. THE INCORPORATION INTERPRETATION
 
 27
 "Default under [certain agreements]" in the restrictive legend might mean "default as defined by [those agreements]." I shall refer to this reading as the "incorporation interpretation." Under the incorporation interpretation, "under" is effectively a verbal shorthand by which the parties incorporate by reference the terms reached in other agreements. This is a common usage of the word "under." If we accepted this reading, we would refer to the AIG-AARK security agreement to see when there was a default as defined therein in order to decide whether there was a default as that term is used in the restrictive legend.
 
 
 28
 Whether the plain-meaning or incorporation interpretation is correct depends upon what Christiana and AARK intended by the phrase "default under [certain agreements]" when they drafted the restrictive legend. The majority never refers to any direct evidence of what the parties intended. Instead, it offers arguments based on circumstantial evidence that the parties could not have meant to incorporate the term default as defined in the AIG-AARK security agreement; the majority thus concludes that the plain meaning interpretation must be correct. The majority has three main arguments, none of which I find convincing. I shall list them here, and then address them in turn: (A) the failure of the restrictive legend to use precisely the same terms as did the AIG-AARK security agreement; (B) the contrasting evidence of the Christiana-AIG Overlease Agreement; and (C) the "functional" differences between "default" and "event of default."
 
 
 29
 A. Failure of the Restrictive Legend to Use the Same Terms as the AIG-AARK Security Agreement
 
 
 30
 The majority's most significant argument can be summarized as follows. In technical corporate documents such as the recourse notes between Christiana and AARK, terms are incorporated only through the use of exactly the same words that are used in the referenced documents. There is no definition of "default" in the security agreement that could be incorporated through the restrictive legend. See Maj. Op. at 1213 ("the exculpatory clause cannot incorporate anything from [the AIG-AARK security agreement] because the word default is simply not defined in that document"). Moreover, the inexact term "default" in the restrictive legend cannot have been intended to incorporate the term "Event of Default." Hence, the majority concludes, an incorporation interpretation of "default under [certain agreements]" is impossible.
 
 
 31
 Contrary to the majority, I do not believe that the general precision of corporate documents is sufficient evidence of the absence of incorporation to justify a grant of summary judgment. Our focus must be on the intention of the parties to these documents, which I find far from clear. Not only do I see no compelling evidence that AIG and AARK intended incorporation to occur only through the use of exact terms, but I find strong indications that they may in fact have intended the inexact term "default" to refer to the default provisions of other documents. I therefore do not find conclusive either the failure of the AIG-AARK security agreement to define "default" or the failure of the restrictive legend to use the defined term "Event of Default."
 
 
 32
 The majority points merely to the circumstantial evidence of lack of identity of the terms to support its conclusion that AIG and AARK recognized a distinction between the term "default" in the restrictive legend of the recourse notes and the term "Event of Default" in the security agreement. It states that "[u]pon a review of all the referenced documents, it becomes clear that when the parties intended to create a term of art or to incorporate specific definitions from other documents, they capitalized the referencing terms and then utilized the same term in the referenced document." Maj.Op. at 1214. However, the majority's only example in support of its argument, however, does not involve a contract between AARK and Christiana, but a contract between AARK and AIG. Maj. Op. at 1214-15 (sales agreement between AIG and AARK incorporating by express reference certain terms of the lease agreement between AIG and Air Florida). Although this document may have some probative value, it surely is not sufficient evidence to support a conclusion, for purposes of summary judgment, that when AARK and Christiana wanted to incorporate by reference they invariably did so by reproducing the language of the referenced document.
 
 
 33
 On the other hand, there is a good reason that the restrictive legend would not be able to use the exact language of the incorporated document as did the AIG-AARK security agreement: the restrictive legend relieved Christiana of its obligations under the notes upon the default by any party to any of several documents. The different documents may have used different terms, or had different conditions, and, thus, AARK and Christiana may have preferred to use a broad term that could apply to all of the underlying documents. By contrast, the exculpatory clause in the AIG-AARK sales agreement which the majority analogizes to the restrictive legend at issue in this case referred only to the Air Florida-AIG lease agreement. It is thus no surprise that the AIG-AARK sales agreement used the precise language of the underlying lease.[5]
 
 
 34
 Moreover, there is evidence that AIG and AARK intended the terms "default" and "Event of Default" synonymously. The most telling evidence of this intention is that the definition and entire discussion of "Event of Default" in the AIG-AARK security agreement is found under a heading marked simply "Default." See supra note 2. This is a strong indication that the parties meant "default" and "Event of Default"[6] synonymously. It is further evidence of the parties' intent that nowhere in the contract do they use the term "default" except in the phrase "Event of Default." Therefore, to distinguish between the terms "default" and "Event of Default" would appear to be contrary to the wishes of the parties to the underlying contract, AIG and AARK.
 
 
 35
 The parties' intention that the terms "default" and "Event of Default" be used synonymously is further supported by the deposition testimony of Mr. McCanless, the president of AIG (the victim of the alleged default by AARK). Upon questioning by Christiana's counsel, Mr. McCanless testified in relevant part as follows:McCanless: From my standpoint, no, they were not in default. The beginning of the default only exists when notice is rendered of an existence of a default condition, and the notifiee--or whatever you want to call it--fails to cure.
 
 
 36
 * * *
 
 
 37
 Q: What did you say to Mr. Lippe [Christiana's attorney]?
 
 
 38
 A: I said no they were not in default, that--that they would not be in default until I notified them of default and they had the chance to cure it.
 
 
 39
 * * *
 
 
 40
 Q: When you say the word or term "technically in default," what do you mean?
 
 
 41
 A: Well, the documents are very clear. You know, a condition--a default under the agreement does not exist until an event of default has occurred, first of all; and second of all, that the party commiting [sic] that event of default has been so notified by the other party and fails to cure it within the cure period, which in the case of a late payment, I think it's ten days, and there are various other longer cure periods depending upon what other conditions or events.
 
 
 42
 * * *
 
 
 43
 A: I will say that that is the way the leasing industry works, as far as default events are concerned. I'm very familiar with those kinds of circumstances. That's the way it works.
 
 
 44
 App. at 183, 187, 191. This testimony demonstrates that at least one of the parties to the AIG-AARK agreement understood no distinction between "default" and "Event of Default."
 
 
 45
 B. A Comparison of the AIG-AARK Security Agreement with the Christiana-AIG Overlease Agreement
 
 
 46
 The majority's second argument against the incorporation interpretation is that "default" and "Event of Default" mean very different things, and that whereas "Event of Default" has a very technical meaning, default has an "ordinary plain meaning." Maj.Op. at 1214-1215. Therefore, the argument runs, it would be a mistake to interpret "default" in the restrictive legend in terms of "Event of Default," as defined in the AIG-AARK security agreement.
 
 
 47
 The majority relies on the Overlease Agreement between Christiana and AIG to prove its point that "default" and "Event of Default" refer to separate things. It is indeed true that in that document "Event of Default" is defined in terms of "default." Because something cannot be defined in terms of itself, the majority makes a strong case that insofar as the Overlease Agreement is concerned the two terms cannot be synonymous. See App. at 418-19. But the use of the terms in one agreement does not control the use of those terms in another agreement, especially when the parties to the agreements are not the same. Because there is not an identity of the parties between the agreements, the terms of the Overlease Agreement can be only minimally probative of the meaning of the AIG-AARK security agreement, the subject of this appeal.[7]
 
 
 48
 C. The Alleged "Functional" Difference between Default and Event of Default
 
 
 49
 The majority's final argument is predicated on the observation that under the restrictive legend, a "default under [specified agreements]" relieves Christiana of the obligation to pay off its recourse notes, whereas under the AIG-AARK security agreement the occurrence of an "event of default," would give AIG the right to repossess the aircraft.[8] Thus, the majority concludes, the terms "default" and "Event of Default" "are not functional equivalents and therefore ... one does not incorporate the other." Maj.Op. at 1214.
 
 
 50
 This argument is specious. It is of course true that only the terms of the AIG-AARK security agreement would give a party a right to possession, whereas the terms of the restrictive legend could not, for the former is a security agreement while the latter is not. Using this reasoning, a document that is not a security agreement could never incorporate by reference an operative term of a security agreement because the security agreement, by definition, involves equity interests and a sales agreement or promissory note does not. Obviously, this cannot be the case.
 
 
 51
 D. Conclusion: There Is a Genuine Question About the Meaning of "Default" in the Restrictive Legend
 
 
 52
 The majority thus raises no conclusive argument to support its holding that the plain-meaning interpretation of "default" is correct. While it points to circumstantial evidence against the incorporation interpretation, its analysis leaves unclear the intention of the parties to the recourse notes, AIG and AARK. The incorporation interpretation is certainly a reasonable reading of the phrase "default under [certain agreements]." On the basis of the evidence now before the court, it is possible to conclude that the parties intended the phrase to be read this way. Because there still exists a question as to the intention of AIG and AARK with respect to the meaning of "default," summary judgment is inappropriate.
 
 III. THE EVIDENCE OF TRADE CUSTOM
 
 53
 Even if I were to agree with the majority that the incorporation interpretation is incorrect because the term "default under [certain agreements]" does not mean "default as defined [in those agreements]," I would still not agree that the plain meaning interpretation is necessarily correct. I disagree with the majority's implicit belief that the meaning of "default" is plain and immutable. Even a common term like "default" may have variable meanings depending on the trade custom and usage. In such a case the meaning of the term must be determined from the industry practice and trade usage. There is significant evidence on the record that in the airplane leasing trade, default does not mean "failure to pay exactly as specified by the contract," but has a more flexible meaning, and therefore that AARK did not default on its notes to AIG as "default" is used in the airplane financing and leasing trade.
 
 
 54
 Evidence on the record suggests that in large airplane leasing transactions, it is customary for parties to installment contracts to defer their initial payments and pay greater sums later, regardless of the explicit payment schedule outlined in the contract. Thus, for example, Mr. McCanless testified that "[i]n the normal business practice in transactions of this type, it is that the packager [AARK] doesn't normally pay the leasing company [AIG] at closing. It pays them after the investor's notes are discounted." App. at 181. Similarly, in a passage quoted above, see supra at 1219, Mr. McCanless explained that the "Event of Default" provision was merely a synopsis of the industry's standard practice: "I will say that that [i.e., the Event of Default provision] is the way the leasing industry works, as far as default events are concerned. I'm very familiar with those kinds of circumstances. That's the way it works." Id. at 191.
 
 
 55
 Looking at this testimony in the light most favorable to Derry, I believe that a reasonable jury could have found on the basis of the evidence presented that AARK's failure to pay AIG on the dates specified in the notes was not a "default" in light of the custom of the airplane leasing trade.
 
 IV. THE APPROPRIATE STANDARD OF REVIEW
 
 56
 My differences with the majority are not merely random, but stem from a common source--our different perceptions of this court's role in this dispute. The majority states that both Christiana and Derry argue that their proposed interpretations--the plain meaning or incorporation interpretations--are "unambiguous[ly]" correct. Maj.Op. at 1213. After stating Derry's position and rejecting it for the reasons described and criticized above, the majority is left with Christiana's interpretation, upon which it affirms the judgment of the district court.
 
 
 57
 In my opinion, this is not the proper way to proceed. Even if both parties did contend that their interpretations were unambiguously correct,[9] we could not then simply choose between the profferred interpretations the one that we felt was most likely correct. Rather, because this is an appeal of an order granting summary judgment, Fed.R.Civ.P. 56, our job is to determine not which of the parties' positions is more persuasive, but whether, considering the evidence in the light most favorable to the opponent of the motion, there are any disputed issues of material fact. If there are, then, regardless of what the court thinks as to their ultimate merit, we must reverse the grant of the summary judgment and allow the jury to hear the evidence.
 
 
 58
 I believe that I have shown that the issue of intent, clearly an issue of material fact, is genuinely disputed. I would therefore reverse the grant of summary judgment. I respectfully dissent.
 
 
 
 [1]
 The "Event of Default" provision in Security Agreement-I is captioned "Default", but we must disregard the caption because another section of the Agreement states that the captions are meaningless. In addition, another document in the transaction, which is unrelated to this appeal, grants the secured party rights upon the occurrence of a "Default" and specifically defines "Default," not "default." See Joint Appendix at 276-85 (Security Agreement between First National Bank of Dallas and AIG). It is clear in this document that "Default," unlike "default," is a term of art
 
 
 [2]
 Subject, of course, to any prior security interests
 
 
 [3]
 Derry does not argue on appeal, as it did in the district court, that Christiana waived its rights under the exculpatory clause
 
 
 [1]
 A jury demand was made in the district court
 
 
 [2]
 The legend is reproduced at greater length at Maj.Op. at 1213
 
 
 [3]
 The section of the AIG-AARK security agreement defining "Event of Default" reads in full as follows:
 
 
 [3]
 Default
 
 
 [3]
 1 The term "Event of Default", as used herein, shall mean the occurrence and continuation of any one or more of the following events:
 (a) The failure of Debtor promptly and faithfully to pay, observe and perform when due any of the Obligations, subject to Debtor's rights under Section 3 of the Installment Note, and such failure shall continue for a period of ten (10) days after written notice thereof; or
 (b) The material misrepresentation or breach by Debtor of any material warranty or covenant to the Secured Party under this Agreement, the Sales Agreement or the Participation Agreement, which misrepresentation or breach of warranty or covenant shall continue for a period of ten (10) days after written notice specifying the same; or
 (c) The commission by Debtor or the occurrence of any of the following acts:
 (i) admitting in writing its inability to pay its debts generally as they become due;
 (ii) filing a petition in bankruptcy or a petition to take advantage of any insolvency act;
 (iii) making an assignment for the benefit of its creditors;
 (iv) consenting to the appointment of a receiver for itself or for the whole or any substantial part of its property;
 (v) on a petition in bankruptcy filed against it, being adjudicated a bankrupt;
 (vi) filing a petition or answer seeking reorganization or arrangement or other aid or relief under any bankruptcy or insolvency laws or any other law for the relief of debtors; or
 (d) The entry by a court of competent jurisdiction of any order, judgment or decree appointing, without the consent of Debtor, a receiver for Debtor or for all or substantially all of its property, or approving a petition filed against it seeking reorganization or arrangement of Debtor under any bankruptcy or insolvency laws or any other law for the relief of debtors, which order, judgment or decree shall not be vacated or set aside or stayed within sixty (60) days from the date of entry thereof; or
 (e) The assumption by any court of competent jurisdiction of custody or control of Debtor or of all or substantially all of its property under the provisions of any law for the relief of debtors, which custody or control shall not be terminated or stayed within sixty (60) days from the date of assumption of such custody or control.
 
 
 [4]
 See Maj.Op. at 1213 ("[T]he unambiguous meaning of default is its plain meaning, failure to pay or perform."); id. at 1214 ("the word default means failure to perform")
 
 
 [5]
 The relevant clause in the AIG-AARK sales agreement reads as follows:
 
 
 [5]
 Assignment of Rights under Purchase Agreements
 Seller hereby assigns to Buyer all of the Seller's rights and interests in and to the Purchase Agreement dated as of May 16, 1979 between Air Florida, Inc. and Singapore Airlines Limited and Sales Agreement I between Air Florida, Inc. and AIG 737-I, Inc. (the "Purchase Agreements") to the extent that the same relate to the Equipment and the purchase and operation thereof; provided, however, that Buyer shall not exercise any of Seller's rights under the Purchase Agreements unless there has occurred an Event of Default under the Lease Agreement dated as of the date hereof between Seller and Air Florida, Inc., a Delaware corporation.
 
 
 [6]
 The majority makes much of the fact that in the restrictive legend the term "default" is in lower case letters, whereas in the AIG-AARK security agreement defined terms are capitalized. See Maj.Op. at 1214. The majority's suggestion on this point strikes me as hypertechnical. I would not place any weight on the difference in capitalization which may have been no more than a typist's peccadillo. Such a minor point should not be a ground on which a party is denied a right to have its case heard by a jury
 
 
 [7]
 Indeed, to the extent that the Overlease Agreement is at all probative of the relationship between the terms "default" and "Event of Default," in the AIG-AARK security agreement, I would argue that it supports the contention that as those terms are used in the security agreement, they mean the same thing. Unlike the AIG-AARK security agreement, which, as noted above, defines "Event of Default" in a section entitled "Default," and which never uses the term "default" except in the phrase "Event of Default," the Overlease Agreement defines "Events of Default" in a section entitled "Events of Default," and, as just noted, defines "Events of Default," in terms of "default." The differences between the two documents suggest that the signers of the Overlease Agreement recognized a distinction between "default" and "Event of Default" that the signers of the AARK-AIG security agreement did not recognize
 
 
 [8]
 The AIG-AARK security agreement reads in relevant part as follows:
 
 
 [3]
 2 Upon the occurrence of an Event of Default, the Secured Party shall have, in addition to all the rights and remedies of a secured party under the Uniform Commercial Code, the right to:
 (i) take possession of any or all of the Equipment wherever situated and, for such purpose, enter upon any premises; and
 (ii) sell, dispose of, hold, use or lease any or all of the Equipment as the Secured Party in its sole discretion shall decide; provided, however, that should the Secured Party decide to foreclose, such rights and remedies shall be subject and subordinate to the Bank Lien and with respect to any lease of the Equipment, the rights of any lessee of the Equipment so long as it shall not be in default of any of the provisions of any lease of the Equipment to quiet and peaceful possession of the Equipment and to the unrestricted use of the Equipment for its intended purpose. The Secured Party shall give Debtor reasonable notice of the time and place of any public or private sale or other intended disposition of all or any portion of the Equipment. Debtor agrees that the requirements of reasonable notice shall be met if notice is mailed by certified or registered mail, return receipt requested, to Debtor at its address set forth hereinabove written not less than ten (10) business days prior to the sale or disposition. Expenses of retaking, holding, preparing for sale, selling or the like shall be paid by Debtor. Subject to the provisions of Section 3.3 hereof, the Secured Party's rights and remedies, whether pursuant hereto or pursuant to the Uniform Commercial Code or any other statute or rule of law conferring rights similar to those conferred by the Uniform Commercial Code, shall be cumulative and not alternative.
 
 
 [3]
 3 The Secured Party shall look solely and only to the Collateral for the payment, performance and observance of all of the obligations in respect of the Sales Agreement, the Installment Note, this Security Agreement, and any other agreement, instrument or document executed in connection with or related to the transactions described herein or therein (which documents are collectively referred to as the "Operative Documents"); and the Secured Party, for itself and its successors and assigns, hereby expressly waives any right to enforce payment and performance by Debtor of the Operative Documents, other than to proceed against the Collateral in the event of any Event of Default hereunder. The foregoing shall not be construed to diminish the obligations of Debtor evidenced by the obligations in respect of the Operative Documents, buy [sic] only to limit the remedies of the Secured Party in the event of any default hereunder
 
 
 [3]
 4 The Secured Party, by act, delay, omission, or otherwise, shall not be deemed to have waived any rights or remedies, or both, hereunder unless such waiver is in writing signed by the Secured Party and only to the extent therein set forth. A waiver by the Secured Party of any right or remedy, or both, on any one occasion shall not be construed as a bar to or waiver of any such right or remedy, or both, to which the Secured Party would otherwise be entitled on any future occasion
 
 
 [9]
 In fact, Derry alleges inter alia not that its interpretation is unambiguously correct, but that there were material issues of fact to be determined by the trial court, and therefore summary judgment in favor of Christiana was improper. See Derry Br. at 1218