*775 OPINION OF THE COURT
Stanley L. Sklar, J.
Can a home improvement contractor, which was unlicensed at the time a contract was solicited and executed, collect for work performed under the contract after the contractor’s license application has been accepted by the Department of Consumer Affairs (the Department)? I hold that the contractor can collect for such work if the homeowners have ratified the contract after the contractor’s license application has been accepted.
Petitioners Kent Klineman, an attorney, and Hedy Kline-man move pursuant to CPLR 7503 (b) to permanently stay the arbitration demanded by respondent NJS Incorporated on the ground that the construction contract containing the arbitration clause is void and unenforceable because of the alleged failure of NJS and its predecessor to comply with the licensing requirements imposed by Administrative Code of the City of New York § 20-385 et seq. NJS cross-moves to compel arbitration.
The construction contract at issue was entered into by petitioner and NJS’ predecessor, nonparty PVS, Incorporated, on January 29, 1990 when petitioners retained PVS to perform extensive construction and remodeling work on their condominium home located in Manhattan. The contract was executed by nonparty Patrick V. Stolmeier, as PVS’ president. Stolmeier is also president of NJS.
PVS began work on petitioners’ home in January 1990. Petitioners began making progress payments under the contract in April 1990. On September 18, 1990 PVS filed for a home improvement contractor’s license and was given a license number by the Department which deems a party licensed once its application has been accepted (see, Department of Consumer Affairs, letter of Jan. 14, 1993). On that same date PVS and the Klinemans executed a document which, by its express terms, amended and expanded the January 29, 1990 contract to include PVS’ license number. A license was issued to PVS on October 2,1990.
In August 1990 Stolmeier created NJS, and on November 9, 1990 NJS filed for a home improvement license. According to Stolmeier, based on Klineman’s legal advice NJS was formed at Klineman’s behest and the contract assigned to NJS to avoid "problems” on the Klinemans’ project arising from a possible execution on a judgment against PVS in an unrelated *776 matter which allegedly could have had an adverse impact on the work being performed for the Klinemans. The exact nature of these problems is not revealed and is difficult to envision since a home improvement contractor is required to deposit all payments in accordance with Lien Law § 71-a (4) or to post a bond or contract of indemnity in lieu of the bond. Klineman denies that the incorporation of NJS and the assignment of the contract were based on reliance on his "legal” advice since Stolmeier had his own attorney. Stolmeier represents that subsequent to NJS’ filing and NJS’ receipt of a formal license issued on November 27, 1990, PVS assigned the modified contract to NJS and NJS began work on the project.
At some point a dispute arose concerning almost $650,000 in previously billed labor and expenses which petitioners allegedly improperly refused to pay. NJS demanded arbitration before the AAA under the "January 29, 1990” contract prompting petitioners to file the instant petition to stay.
Petitioners contended in their initial papers that the contract, including the arbitration clause, was void and unenforceable at its inception because PVS had not obtained a home improvement contractor’s license prior to soliciting, obtaining and commencing performance of the contract; nor had PVS even applied for a license until about eight months after signing the contract and commencing work under it. Petitioners also urged that the contract was void even if they were aware of and took advantage of the contractor’s status. Petitioners further asserted that the void contract was not revived or superseded by the September 1990 amendment which they signed with PVS. In addition, petitioners claimed, notwithstanding that the September 1990 amendment was executed by PVS, rather than by NJS, and that PVS had sent invoices to petitioners in October and December 1990 for work through September and November 1990 respectively, that NJS did not assume the contract after it filed for and received its license in November 1990 but, rather, assumed it in August 1990 as evidenced by the fact that the Klinemans had made their first payment to NJS on August 23, 1990. The Kline-mans also noted that no copy of the alleged assignment has been provided. The Klinemans maintained, inter alia, that because NJS was unlicensed when it assumed the contract it could not enforce that contract. Finally, the Klinemans asserted that because the contract, including its arbitration clause, was unenforceable, even if NJS could collect in quantum meruit for work performed after it was licensed (see, *777 Matter of Hirsch Constr. Corp. [Cooper], 181 AD2d 52, 57 [1st Dept 1992]; Todisco v Econopouly, 155 AD2d 441, 442, lv dismissed 76 NY2d 772), this application to stay arbitration must be granted, and NJS would be relegated to an action at law.
NJS in opposition claimed that the agreement had not been assigned and that it did not begin to perform work under the agreement until after it received its license in November 1990. NJS claimed that Klineman made checks payable to NJS before that time so as to "conceal the fact that PVS was working on the project” and to "shield [Klineman’s] project from any interruptions in construction which might arise from execution on a judgment which might be obtained against PVS in an unrelated lawsuit.”
NJS, relying on Beacon Term. Corp. v Chemprene, Inc. (75 AD2d 350 [2d Dept 1980], lv denied 51 NY2d 706), also asserted that the amendment of the January 1990 contract in September 1990 which added, inter alia, PVS’ license number, constituted a new agreement, and that because at the time of the new agreement PVS was deemed licensed by the Department, it and its assignee, which was licensed when it assumed the contract, were entitled to collect for any work performed under that new agreement. NJS does not assert that there was a novation in September 1990.
The issue is can NJS seek to enforce the contract in arbitration?[1] The determination of whether a contract is unenforceable on public policy grounds may be made by the court on an application for a stay of arbitration. (Matter of Hirsch Constr. Corp. [Cooper], 181 AD2d 52, 57 [1st Dept 1992], supra; Hirsch v Hirsch, 37 NY2d 312, 315 [1975].)
Section 20-387 (a) of the Administrative Code provides in its entirety that "No person shall solicit, canvass, sell, perform or obtain a home improvement contract as a contractor or sales *778 person for an owner without a license therefor.” The violation of this provision constitutes a misdemeanor punishable by imprisonment. (Id., § 20-401; cf., Mortise v 55 Liberty Owners Corp., 102 AD2d 719 [1st Dept 1984], affd 63 NY2d 743.) The purpose of the foregoing licensing requirement is to "protect the homeowner against abuses and fraudulent practice.” (Administrative Code § 20-385; see also, B & F Bldg. Corp. v Liebig, 76 NY2d 689, 692 [1990].) In furtherance of that purpose the Department, which licenses home improvement contractors, has promulgated various rules and regulations and requires home improvement contractors to furnish it with a bond conditioned on, inter alia, compliance with those rules and regulations (see, 6 RCNY 2-225). Among the rules issued by the Department are those pertaining to the required contents of all home improvement contracts. (6 RCNY 2-221.) For example, each contract is required to have a statement in bold-faced type informing the buyer of the right to cancel within three days (6 RCNY 2-221 [a] [10]). In addition, the Department has issued rules which regulate advertising and selling practices.
The courts, in order to protect owners, require strict compliance with the licensing statute and have uniformly held that the statute bars any recovery for breach of contract or in quantum meruit on the part of the home improvement contractor who is unlicensed (see, e.g., Mortise v 55 Liberty Owners Corp., supra; Chosen Constr. Corp. v Syz, 138 AD2d 284, and cases cited therein), "regardless of whether the work performed was satisfactory, whether the failure to obtain the license was willful or, even, whether the homeowner knew of the lack of the license and planned to take advantage of its absence” (Chosen Constr. Corp. v Syz, supra, at 286). The lack of a license allows the owner to avoid its contractual obligations notwithstanding that there seem to be ample regulatory and judicial sanctions (see, e.g., Administrative Code §§ 20-104, 20-105, 20-106; but cf., Lloyd Capital Corp. v Pat Henchar, Inc., 80 NY2d 124 [1992]). The licensing requirement is so important that it cannot be waived. (Administrative Code § 20-394.)
There is no dispute that PVS and NJS are home improvement contractors performing work within the meaning of the licensing statute, or that PVS was unlicensed at the time Stolmeier on behalf of PVS solicited, obtained and began performance of the January 29, 1990 contract.
NJS asserted however that because on September 18, 1990, *779 the date PVS’ license application was accepted by the Department, the parties amended the January 1990 contract, thereby giving rise to a new agreement, PVS and its assignee NJS, which was allegedly licensed when the contract was assigned and when NJS began to perform under that new agreement, were entitled to collect under that new agreement for work performed after that new agreement was executed. The court does not agree. First, NJS did not seek arbitration under any September 1990 agreement but only under the January 29, 1990 contract. Second, it would subvert the public policy of protecting homeowners against "abuses and fraudulent practices” (Administrative Code § 20-385) if a contractor could sanitize a contract which was originally solicited and obtained and commenced in violation of section 20-397 of the Administrative Code by merely having an unwitting homeowner execute a document which makes minor additions to the original unenforceable contract, after a license was obtained.
Notwithstanding the foregoing, NJS asserted it was still entitled to recover for the work performed by it after the contract was assigned and after the Department accepted its license application, and evidently for any work performed by PVS before PVS assigned the contract and after PVS’ license application was accepted by the Department.[2] NJS based this position on a letter issued by the Department on April 13, 1992 which indicated that "license applicants are permitted to operate immediately after filing with our Department.” NJS apparently equated "operates” with performance of a contract. However, the Administrative Code does not merely prohibit one from performing a home improvement contract but also prohibits one from soliciting or obtaining (see, Matter of Heller [Clark Constr. Corp.], 178 AD2d 195 [1st Dept 1991]) such a contract. As noted above, the Department promulgated rules pertaining to the contents of such contracts, as well as to advertising and selling practices in furtherance of its goal of protecting owners against abuses and fraudulent practices. It would seem to thwart the public policy underlying the promulgation of these rules if a contractor were allowed to violate them as long as, some time in the midst of performing a nonconforming contract or a contract procured by sharp sales practices, the contractor applied for and thereafter re *780 ceived a license. Thus, when the Department told respondent’s counsel that respondent could "operate” upon filing its application it appeared that it was only referring to the solicitation and performance of new contracts.
In addition, the Appellate Division, First Department, in construing CPLR 3015 (e) in B & F Bldg. Corp. v Liebig (155 AD2d 377 [1989], affd 76 NY2d 689 [1990], supra), affirmed the lower court’s ruling that in order to seek enforcement of its contract the contractor must have "(1) a valid license at the time of pleading, and (2) a valid license at the time of the contract and work” (Sup Ct, NY County, Dec. 14, 1988, Cohen, J., index No. 07076/87, at 4, citing Zandell v Zerbe, 139 Misc 2d 737, 740 [Civ Ct, NY County 1988], supra; emphasis added).
Nonetheless, because of the lack of clarity of the Department’s April 13, 1992 letter, the fact that various provisions of the Administrative Code (§ 20-105 [b] [2]; § 20-105 [d]) when read together could be construed as permitting the contractor to work on a contract obtained without a license, after the contractor filed its license application, and because the reported cases involving licenses acquired after the contracts were executed were limited essentially (see, n 1, infra) to those in which the contractor was licensed following completion of the work, I consulted with both counsel and then with their concurrence invited the Commissioner of Consumer Affairs to submit an amicus brief.
By response dated January 14, 1993 the Department answered that the April 13, 1992 letter "did not and was not intended to address the legal issues raised in this case,” and that "[t]he Department has always taken a strict view of treating any home improvement contract entered into prior to a contractor being licensed as illegal and unenforceable.” The Department also rejected the suggestion that the aforementioned provisions of the Administrative Code legitimized the work performed under a contract after a license application had been filed where the contract was solicited, signed and commenced before the license application was filed. The Department concluded that "[a]ny home improvement contract entered into prior to the time an application has been accepted by us should be considered illegal and unenforceable unless the contract was ratified by the consumer after the contractor became licensed. ” (Emphasis added.) (Department of Consumer Affairs, letter of Jan. 14, 1993, at 2.)
NJS, in response to the Department’s January 14, 1993 *781 letter, now takes the position that by signing the amendment dated September 18, 1990 which included, inter alia, PVS’ license number, with "awareness of the license issue” (Coren, letter of Feb. 8, 1993) the Klinemans ratified the unenforceable contract. The Klinemans’ attorney rejects this assertion and observes that NJS has set forth no evidence demonstrating that the Klinemans knew at the time they executed the amendment that PVS previously had been unlicensed, The Klinemans’ counsel further claims that even if the Klinemans were aware, when they signed the amendment in September 1990, that PVS had previously been unlicensed such knowledge does not avail NJS since there is evidence suggesting that NJS, rather than PVS, was performing the contract at the time of the alleged ratification, and that since NJS was unlicensed at the time of the alleged ratification of PVS’ previously unlicensed status, such ratification does not avail NJS.
The Klinemans also, in a supporting memorandum of law, informed the court that after this proceeding was commenced they, by letter dated December 9, 1992, purported to terminate the contract even though the letter indicated that petitioners had previously, by letter dated December 13, 1991, given notice of the contract’s termination. The effect and validity of any purported termination, however, would be for the arbitrator, assuming that the contract was not unenforceable on public policy grounds. (Matter of Schlaifer v Sedlow, 51 NY2d 181, 185 [1980].) Whether the contract is unenforceable depends on whether the contract was ratified by the Kline-mans after the Department accepted PVS’ license application and whether PVS assigned the contract to NJS after any such ratification and after the Department had accepted NJS’ license application.
Since whether the Klinemans were aware of PVS’ prior lack of a license at the time the amendment was executed is wholly within their personal knowledge, and since it is unclear when PVS assigned the contract to NJS, a hearing is necessary. Accordingly, the issues of when PVS assigned the contract to NJS and whether the Klinemans ratified the contract when they signed the amendment on September 18, 1990 are referred to the Legal Support Office for assignment *782 to a Special Referee to hear and report with recommendation. Pending receipt of the report and a motion pursuant to CPLR 4403, final determination of this application is held in abeyance.
[Portions of opinion edited for purposes of publication.]

. One recent case (Matter of Hirsch Constr. Corp. [Cooper], 181 AD2d 52, 56 [1st Dept 1992], supra) relying on another case (Todisco v Econopouly, 155 AD2d 441, 442, lv dismissed 76 NY2d 772, supra) seems to suggest that a contractor could collect in quantum meruit for work performed after it obtained its license. However, the Todisco Court apparently relied for that proposition on Zandell v Zerbe (139 Misc 2d 737) which held (at 740) that the contractor must have "a valid license at the time of pleading * * * [and] at the time of the contract and work.” (Emphasis added.) However, I do not and need not reach the issue of whether NJS can recover in quantum meruit in the event that the contract from which the right to arbitrate is derived is unenforceable because, even if it can recover in quantum meruit, NJS must commence a plenary action.

. It is not entirely clear from the record when the work for which payment is sought was performed nor is it clear when the contract was assigned.