BEACON TERMINAL CORPORATION, Appellant, v CHEMPRENE, INC., Respondent.

Second Department, June 30, 1980

APPEARANCES OF COUNSEL

*Warshaw Burstein Cohen Schlesinger & Kuh (Jay A. Kranis* and *Marc E. Richards* of counsel), for appellant.

*Van DeWater & Van DeWater (David D. Hagstrom* of counsel), for respondent.

**OPINION OF THE COURT**

LAZER, J.

In 1964 Beacon Terminal Corporation, the owner of an industrial complex in Beacon, New York, entered into a new 10-year lease with its tenant, Chemprene, Inc., which had rented certain buildings in the complex since 1952. As had

been provided in earlier leases, the new agreement required Beacon to sell steam to Chemprene for its manufacturing processes. Although the preceding lease had unequivocally linked the cost of the steam directly to the actual cost of the fuel oil needed to produce it, the 1964 lease contained a new provision which seemed to alter the method of cost computation. Section 8[e] of the lease pertinently stated:

"The steam rate * * * is based upon a tank wagon price for No. 6 fuel oil delivered at Beacon, New York of $5.85 per 100 gallons. If for any calendar month the average price of such fuel oil, based upon New York City prices quoted in the Journal of Commerce, plus cost of delivery to Beacon, New York, increases or decreases, Tenant shall pay an additional amount for steam for such month equal to, or shall be credited with an amount equal to 1.3 times the average increase or average decrease in fuel oil price over or below $5.85 for such month times the number of gallons of fuel oil consumed by Landlord's plant during such month for such steam furnished to Tenant. The number of gallons consumed shall be determined by the following formula:

$$\frac{\text{Number of pounds of steam delivered to Tenant during month, per meters}}{105} = \frac{\text{Number of gallons of fuel oil consumed}}{}".$$

Notwithstanding any change which may have been reflected in section 8[e], for the seven years which followed the execution of the 1964 lease, Beacon's officers and employees, including at least one who had been instrumental in negotiating the lease, continued the earlier practice of billing Chemprene for steam in accordance with the actual cost of fuel oil. As a consequence, Chemprene paid substantially less for steam than it would have done had the prices charged been keyed to Journal of Commerce quotations. Following a real or imagined insult in 1971, however, Beacon's president, Sherman Weiser, re-examined the lease and directed that Chemprene be billed for steam in accordance with fuel oil prices quoted in the Journal of Commerce for New York City. Although the change resulted in a significant increase in the cost of steam to Chemprene, it paid the higher bills as they became due without making any protest.

In 1972 Beacon instituted this action in which it sought to recover the sum of $214,153.15 which it alleged Chemprene had been undercharged for steam during the years 1964 to 1971. Contending that under the lease the price of steam was linked directly to the cost of fuel oil, Chemprene counterclaimed to recover its alleged overpayments from the time that Beacon changed its billing procedures in 1971. According to Chemprene, the alleged overcharges had been paid and were not protested because the change in the basis for the billing had gone unnoticed by the personnel concerned with reviewing invoices.

Beacon's effort to obtain summary judgment failed when Special Term denied a motion for such relief and when this court affirmed with the declaration that: "The language of the lease is ambiguous and defendant's affidavits raise factual issues concerning the intent of the parties in the execution of the lease." *(Beacon Term. Corp. v Chemprene, Inc.,* 51 AD2d 566.)

Following a trial, judgment was rendered dismissing Beacon's complaint and awarding Chemprene the sum of $101,728.04 on its counterclaim. It is Beacon's appeal from that judgment that now confronts us.

■ We are in accord with the finding of the trial court that for the period 1964 to 1971 the amounts the plaintiff billed for steam effectuated the parties' intent when they drafted section 8[e] of the lease. Under this construction, the parties intended changes in the price of oil paid for by the plaintiff to be passed along to the defendant through calculations based upon the actual delivered cost of oil to the plaintiff, the reference to *Journal of Commerce* quotations being merely a convenient device for ascertaining the highest price that plaintiff could charge. The trial court thus gave a practical interpretation to the language we had earlier deemed ambiguous (see, e.g., *Brooklyn Public Library v City of New York,* 250 NY 495; *Clark v Carolina & Yadkin Riv. Ry. Co.,* 225 NY 589; *City of New York v New York City Ry. Co.,* 193 NY 543; *Nicoll v Sands,* 131 NY 19; *Woolsey v Funke,* 121 NY 87; *Martin v Cope,* 28 NY 180; Restatement, Contracts 2d [Tent Drafts Nos. 1-7, 1973], § 228), fixed the meaning of the clause as of the date of signing of the lease in 1964, and, in essence, declared what the parties had agreed to at the 1964 reinception of the landlord-tenant relationship. We conclude that these determinations at nisi prius are warranted.

Since the trial court properly found that the meaning of the ambiguous contract was fixed by the parties' conduct, Beacon can defeat its tenant's counterclaim only if it can establish either that the parties modified the lease when the billings were increased in 1971 or that Chemprene waived its rights when it paid the higher bills. On this record, the increased billings which commenced in 1971 and their payment by Chemprene effected neither a modification of the lease nor a waiver of the right to pay for steam on the basis of the actual fuel costs. The modification of a contract results in the establishment of a new agreement between the parties which *pro tanto* supplants the affected provisions of the original agreement while leaving the balance of it intact (see *Becker v Faber,* 280 NY 146; *Clark v Carolina & Yadkin Riv. Ry. Co., supra; Walker v Millard,* 29 NY 375; *Radist v Zidel,* 12 AD2d 648; *Lockwood v Embalmers Supply Co.,* 233 App Div 189; *Hart v Garrett Co.,* 93 App Div 145; 6 Corbin, Contracts, § 1293). Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms (see, e.g., *Becker v Faber, supra; Walker v Millard, supra; Ballard v Friedeberg,* 177 App Div 715). While it is true that modification may be proved circumstantially by the conduct of the parties (see, e.g., *Martin v Peyton,* 246 NY 213), the record here does not manifest the required mutual assent to a change in terms.

At the trial, plaintiff's president, Sherman Weiser, testified that in 1971, after his honesty was affronted by defendant's attempt to verify a rise in the price of oil with plaintiff's supplier, he altered the invoicing procedures for steam consumption. According to Weiser, when he examined the lease to ascertain whether defendant was permitted to obtain verification, he found that the price differential clause made reference to the *Journal of Commerce* price quotations. At that point, he decided that all future steam bills would be rendered on the basis of the prices quoted in that periodical. Apart from the fact that this claim of belated discovery seems to conflict with Mr. Weiser's letter of August 18, 1966 to the defendant making specific reference to section 8[e], the invoice format used for steam charges was not changed, nor was the defendant notified that the bills were being computed by a new formula. The difference in monthly billed prices between the former basis, which was the actual delivered price of oil, and

the new basis—*Journal of Commerce* quotations—occurred during a period of rapidly rising oil prices. As a result, the increase in steam charges was not sufficiently steep to alert the defendant that the method by which it was being billed had been altered.

Two of defendant's employees responsible for reviewing bills testified that the defendant paid steam bills on demand without reviewing their accuracy and that prior to December, 1973, with one exception, defendant never had been advised that billings for the years 1964 to mid-1971 were incorrect. The exception referred to involved freight charges for oil which plaintiff began to bill in February, 1972; it did not involve the price of oil itself. When plaintiff informed defendant by letter that in order to recoup freight charges that had been omitted it was considering recomputation of all bills rendered prior to February, 1972, defendant commenced examination of the monthly steam bills to ferret out the disputed freight charges. Only after plaintiff instituted this action to recover for sums allegedly underbilled for steam supplied prior to 1971 did defendant become aware that plaintiff had begun charging the higher *Journal of Commerce* prices in mid-1971. At that point, the counterclaim for recovery of overcharges was asserted.

■ It is apparent, then, that the existence of the requisite intent to effectuate a modification agreement has not been demonstrated (see *Smith v Kerr,* 108 NY 31; *Browning v Fox,* 183 App Div 778, affd 230 NY 535). Furthermore, it is obvious that the defendant's purported agreement to pay a higher price for steam, without any corresponding alteration in plaintiff's obligations, was not supported either by consideration or a signed writing (see General Obligations Law, § 5-1103; *Matter of Crea,* 27 NY2d 339; cf. Restatement, Contracts 2d [Tent Drafts Nos. 1-7, 1973], § 89D).

■ Finally, it is abundantly clear that Chemprene's overpayments did not constitute a waiver of its rights to obtain compliance with the lease.

"A waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed * * * It is essentially a matter of intention. Negligence, oversight, or thoughtlessness does not create it. The intention to relinquish the right or advantage must be proved * * * The evidence must have probative force sufficient to prove that there was in fact an intention to waive

the right or benefit—a voluntary choice not to claim it." *(Alsens Amer. Portland Cement Works v Degnon Contr. Co.,* 222 NY 34, 37; see, also, *Whipple v Prudential Ins. Co. of Amer.,* 222 NY 39.)

Having decided that the parties intended by their lease that the cost of steam was to be keyed to the actual cost of fuel oil, we find no support for the conclusion that Chemprene made an intentional decision to relinquish the right to pay for steam in accordance with the advantageous method of computation from which it had benefitted for seven years.

Accordingly, there must be an affirmance.

MOLLEN, P. J., HOPKINS and O'CONNOR, JJ., concur.

Judgment of the Supreme Court, Dutchess County, entered May 18, 1978, affirmed, with costs.