Michael SHANE

v.

WCAU–TV, CBS TELEVISION STATIONS, DIVISION OF CBS, INC.

Civ. A. No. 88–5431.

United States District Court, E.D. Pennsylvania.

July 25, 1989.

Robert A. Rosin, Philadelphia, Pa., for plaintiff.

William H. Howard and Maura F. Crough, Philadelphia, Pa., Helen Gold, New York City, for defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This matter comes before the court on defendant's motion for summary judgment. The action arises out of defendant's alleged breach of a contract to air a television commercial. For the reasons stated below, defendant's motion is denied.

BACKGROUND

Since 1986, plaintiff Michael Shane ("Shane") has operated a telephone recorded-message service called Dial Santa. In this system, if a child dials a "976" telephone number, he will access a recording of Santa Claus narrating a Christmas story. After the story, the recorded Santa invites the child to tell him what he wants for Christmas. (Shane dep. at 11, 13, 22, 28, 30–31). In April, 1987, Shane met with Suzanne Banning ("Banning") and Muriel Hons ("Hons"), representatives of the Heron & Young Marketing Communications advertising agency, to discuss their purchasing advertising for Dial Santa on Philadelphia television stations. (Shane dep. at 45; Hons dep. at 25). According to Shane, he was specifically interested in advertising on a network affiliate during Saturday morning children's programming. (Hons. dep. at 42; LaFountaine dep. at 46–50).

In May, 1987, Hons contacted Judith La-Fountaine ("LaFountaine"), a WCAU–TV (CBS' Philadelphia affiliate) advertising account executive, to discuss the feasibility of advertising Dial Santa during the 1987 Christmas season. (Hons dep. at 41–42). According to Hons, she explained to La-Fountaine that Dial Santa was aimed at juvenile callers, and she asked LaFountaine if this would pose a problem with the station's Commercial Clearance Department. (Hons dep. at 42). This department reviews all advertisements and ultimately determines whether the advertisement will air. LaFountaine indicated that there would not be a problem. (Id.).

Based upon Hons' recommendations, Shane decided to purchase advertising time from WCAU–TV during its Saturday morning children's programming. Hons purchased the time for Shane and entered into a contract with CBS through LaFountaine. The contract included a clause incorporating "the terms and conditions ... attached." (Hons dep. at 48–49, 52; Ex. MH–2). The terms and conditions provided that:

All Announcements broadcast pursuant hereto shall be under the sole direction and control of CBS, which shall have the right to refuse to broadcast any Agency Material or any Announcement or Announcements which, in the opinion of CBS: (a) do not maintain a quality creditable to CBS or do not conform to the Regulations hereinafter set forth or to its general programming policies applicable to Station.

(Ex. MH–2). The terms and conditions further provided that CBS would have no liability with respect to any commercial it did not approve. (Id.). The cover letter which accompanied the contract stated that:

It is imperative that we receive commercial material with enough lead time to be broadcast and to properly process it through Continuity Acceptance, Traffic and Technical Operations. To insure this, the following deadlines must be adhered to: 1. Any commercial announcement received that is a single medium (film or tape or single slide) must be

received two (2) calendar days prior to its first scheduled air date.

(*Id.*).

Shane completed production of the Dial Santa advertisement in late July or early August, 1987. (Shane dep. at 11–12, 21–22, 27–28). In the last week of October, 1987, Shane delivered a tape of his Dial Santa commercial to the station. (LaFountaine dep. at 62). Within twenty-four hours, Patti Power, manager of commercial clearance, reviewed the tape. (Power Aff. at ¶ 7). After reviewing the commercial, Power concluded that it could not be broadcast during children's programming because it encouraged children to spend money on calls to Santa Claus at a time when children were likely to be watching television without adult supervision. (Power Aff. at ¶ 8). Power felt constrained by the CBS policy to avoid "[t]he use of language which specifically urges children to buy or obtain a product or service." (*Id.* at ¶ 9 and Defendant's Ex. 3).

Power immediately informed LaFountaine that she would not permit the commercial to be broadcast during children's programming. (LaFountaine Dep. at 63; Power Aff. at ¶ 10). After hearing this news, LaFountaine appealed the decision to Gordon Hughs ("Hughs"), station manager for WCAU–TV. Hughs, however, concurred with Power. (LaFountaine dep. at 66–68). LaFountaine immediately telephoned Hons and told her that WCAU would not air the commercial. Later Hons appealed again to Powers, informing her that the commercial had a money-back guarantee. Despite the guarantee, Allen Shaklan ("Shaklan"), vice-president of programming, news administration, and station services, again rejected the advertisement. (Power Aff. at ¶ 12; Shaklan Aff. at ¶¶ 4–5).

Plaintiff then instituted this action, alleging that in refusing to air his commercial, CBS breached its sales contract. Defendant now moves for summary judgment.

## DISCUSSION

Fed.R.Civ.P. 56(c) instructs a court to enter summary judgment when the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This rule provides the court with a useful tool when the critical facts are undisputed, facilitating the resolution of a pending controversy without the expense and delay of conducting a trial made unnecessary by the absence of factual dispute. *Peterson v. Lehigh Valley District Council*, 676 F.2d 81, 84 (3d Cir.1982); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Summary judgment is inappropriate, however, where the evidence before the court reveals a genuine factual disagreement requiring submission to a jury. An issue is "genuine" only if the evidence is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510.

In a summary judgment action, the moving party bears the initial burden of identifying for the court those portions of the record which it believes demonstrate the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Following such a showing in a case where the non-moving party is the plaintiff and therefore bears the burden of proof, it must by affidavits or by the depositions and admissions on file "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Id.* at 322, 106 S.Ct. at 2552. In making its ruling on a summary judgment motion, the court must view all inferences in a light most favorable to the non-moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Continental Insurance Co. v. Bodie*, 682 F.2d 436 (3d Cir.1982), must resolve all doubts against the moving party, *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.1985),

*cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985), and must take as true all allegations of the nonmoving party that conflict with those of the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Because this is a diversity action, this court must apply state law. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The contract at issue provides, and neither party has disputed, that New York law applies.

Defendant argues that plaintiff can not maintain an action for breach of contract based on defendant's refusal to air the commercial because the contract expressly affords CBS such right. Plaintiff rejects CBS' interpretation of the contract on the grounds that significant issues of material fact remain as to (1) whether defendant's conduct constituted a waiver of its right to reject the advertisement, (2) whether defendant should be estopped from enforcing the refusal terms of the contract, (3) whether defendant breached its duty of good faith and fair dealing, and (4) whether the terms of the contract are ambiguous. We shall deal with plaintiff's arguments in turn.

■ Plaintiff argues that because LaFountaine told him that there would be no problem in getting approval for the commercial, and because CBS continued to deal with Shane on the Dial Santa commercial at a time when it knew or should have known its content, the station waived its right to enforce the refusal terms of the contract. An analysis of the applicability of waiver focuses on the intent of the party allegedly waiving rights; if a party intentionally relinquishes a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement. *Beacon Terminal Corp. v. Chemprene, Inc.,* 75 A.D.2d 350, 429 N.Y.S.2d 715, 718 (1980). Negligence, thoughtlessness, or oversight does not create a waiver. *Id.* 429 N.Y.S.2d at 719. The intention to waive must be clearly established and can not be inferred from doubtful or equivocal acts or language, and the burden of proof is on the party asserting the waiver. *East*

*56th Plaza, Inc. v. Abrams,* 91 A.D.2d 1129, 458 N.Y.S.2d 953, 955 (1983). We find that for the purposes of this motion, plaintiff has minimally met his burden.

■ Interpreting the facts in a light most favorable to plaintiff, when Hons began negotiating with LaFountaine, Hons explained to her the content of the commercial. Hons told her that the commercial would invite children to call Santa, and Hons contracted for Saturday morning programming. When Hons asked LaFountaine if CBS would object to his advertisement, LaFountaine responded that it would not be a problem. The parties discussed the arrangement for six weeks and CBS issued two contracts. At no point during their discussions did LaFountaine mention that CBS had a policy concerning child-directed advertising. Eventually, CBS rejected the advertisement not because CBS found the final product surprisingly odious, but because the *concept* itself was offensive to CBS. These facts might permit a jury to find that LaFountaine waived CBS' right to refuse the advertisement, at least on the grounds of its content.

■ Defendant argues that LaFountaine could not have intended to waive CBS' right of refusal because as a salesperson she did not have the authority make such a determination. "The general rule in New York is that '[o]ne who deals with an agent does so at his own peril, and must make the necessary effort to discover the actual scope of authority.'" *General Overseas Films, Ltd. v. Robin International Inc.,* 542 F.Supp. 684, 688 (S.D.N.Y.1982) (quoting *Ford v. Unity Hospital,* 32 N.Y.2d 464, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 664 (1973)). However, even if LaFountaine did not possess actual authority to determine the suitability of the Dial Santa advertisement concept, she may have had the apparent authority to do so. Apparent authority arises when a principal places an agent in a position where it appears that the agent has certain powers which he may not actually possess. If a third party reasonably believes that the agent was acting within the scope of his authority and detrimentally relies on the agent's act, the principal is

estopped to deny that the agent's act was not authorized. *Id.* at 688–89. The third party must establish, however, that the source of the apparent authority is the principal; the agent can not simply confer authority upon himself. *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir.1978); *Lana Mora, Inc. v. S.S. Woermann Ulanga*, 672 F.Supp. 125, 128 (S.D.N.Y.1987). "The doctrine rests not upon the agent's acts or statements but upon the acts or omissions of the principal. It is invoked when the principal's own misleading conduct is responsible for the agent's ability to mislead." *General Overseas Films*, 542 F.Supp. at 689. *See also E.F. Hutton & Co., Inc. v. First Florida Securities, Inc.*, 654 F.Supp. 1132, 1142–43 (S.D.N.Y.1987).

We must admit that it is difficult to point to any affirmative conduct on the part of CBS that would establish LaFountaine's requisite authority. However, CBS did permit LaFountaine exclusively to deal with Hons up to the point of the commercial's final review. Given her position throughout these stages, one could conclude that it was reasonable for Hons to rely on LaFountaine's representations at least as to the acceptability of the advertisement's concept. The contract certainly made clear that she was not empowered to pass on the ultimate acceptability of the commercial, and Hons' experience in the business would also make unreasonable her position that LaFountaine could make such a final decision; but we can not decide as a matter of law that it was unreasonable for Hons to conclude that LaFountaine was sufficiently familiar with the policies of the station to pass on the preliminary suitability of the advertisement. Thus, plaintiff may have reasonably assumed that he could produce the commercial, and so long as it did not offend CBS in some particular

way beyond its basic concept, the commercial would air. A jury might therefore find that CBS waived its right to reject the concept of the commercial.[1]

■ Shane also alleges that LaFountaine's conduct equitably estops CBS from exercising its rights under the contract. Equitable estoppel arises where one party reasonably relies upon some inequitable or fraudulent conduct of another. *Redington v. Hartford Accident & Indemnity Co.*, 463 F.Supp. 83, 86 (S.D.N.Y.1978). The essential elements of equitable estoppel are as follows: (1) an act constituting a concealment of facts or a false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoer; (4) reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment. *Special Event Entertainment v. Rockefeller Ctr.*, 458 F.Supp. 72, 76 (S.D.N.Y.1978).

■ Defendant argues that plaintiff can not establish the elements for equitable estoppel. Under the first prong of the estoppel analysis, defendant argues that plaintiff is alleging a misrepresentation as to a future fact which can not form the foundation for an estoppel. *See LeBovici v. Jamaica Savings Bank*, 81 A.D.2d 150, 439 N.Y.S.2d 688, 689 (1981), *aff'd*, 56 N.Y.2d 522, 434 N.E.2d 1332, 449 N.Y.S.2d 954 (1982). However, while under some circumstances a declaration concerning future acts may be insufficient, a representation as to the future can operate as an estoppel " 'where it relates to an intended abandonment of an existing right, and is made to influence others, and by which they have been induced to act.' " *Murphy v. Gutfreund*, 583 F.Supp. 957, 967 (S.D.N.Y.1984) (quoting *Insurance Co. v. Mowry*, 96 U.S. 544, 547, 24 L.Ed. 674 (1877)). In

**1.** Defendant argues that we can not find a waiver where there could be no rational basis for one. *See generally Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97, 106 S.Ct. 1348, 1361, 89 L.Ed.2d 538 (1986) ("[T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' ex-

ists...."). However, there clearly are potential rational explanations for LaFountaine's alleged waiver. Quite simply, by waiving its right to reject the commercial's concept, CBS could have provided Shane with further inducement to purchase advertising time from CBS rather than taking his business elsewhere.

the case at bar, as discussed *supra* in our waiver analysis, a rational jury could find that LaFountaine misrepresented the policy of CBS concerning child-directed advertising, and in doing so, intentionally abandoned an existing right to refuse the commercial based on its concept.

Under the second prong of the estoppel analysis, defendant argues that CBS could not have intended or expected that plaintiff would rely on LaFountaine's representations. Defendant suggests that the contract clearly gave CBS the right of refusal and clearly informed plaintiff that there was no guarantee that his commercial would air. Again, despite the contract's reference to the review of the final product, after LaFountaine allegedly approved the advertisement's concept, an argument can be made that she should have expected that plaintiff would rely on her representation.

Under the third and fourth prongs of the estoppel analysis, defendant argues that LaFountaine did not possess the requisite knowledge concerning the policy of CBS, and plaintiff did not detrimentally rely on her representations. Given that the policy concerning child-directed advertising existed as early as June of 1986, a jury could find that LaFountaine knew or should have known about the policy. Plaintiff argues that he detrimentally relied on LaFountaine's representations through unnecessarily producing the advertisement for a Philadelphia audience, committing funds to this production which could have been otherwise directed, and failing to pursue advertising time on another station.[2] These allegations are sufficient to create a jury issue on detrimental reliance. In sum, for the purposes of this motion, plaintiff has met his minimal burden of demonstrating the elements of equitable estoppel.

To withstand the motion for summary judgment, plaintiff also raises the interrelated arguments that the station acted in bad faith in rejecting his commercial, and that the contract language addressing CBS's right of refusal was ambiguous.[3] Specifically, plaintiff asserts that defendant feigned dissatisfaction with his commercial, and the contract did not clearly articulate on what grounds the defendant could reject it. We conclude that the contract is unambiguous and that there is no evidence that would support plaintiff's conclusion that CBS feigned dissatisfaction with his advertisement. Where a contract is unambiguous, we may not reach an artificial interpretation in order to relieve a party from an improvident bargain. *Libra Bank Ltd. v. Banco Nacional de Costa Rica,* 570 F.Supp. 870, 893 (S.D.N.Y.1983). Interpretation of an unambiguous contract is a function of the court. *Chimart Associates v. Paul,* 66 N.Y.2d 570, 489 N.E.2d 231, 233, 498 N.Y.S.2d 344, 346 (1986).

The contract provided CBS with the right to refuse to air any commercial if in the opinion of CBS, it does "not maintain a quality creditable to CBS or [does] not conform to the Regulations hereinafter set forth or to its general programming policies...." (Ex. MH–2). Plaintiff argues that this clause is ambiguous because it does not provide any objective definition of "creditable quality" and does not put a buyer on notice of what standard he must meet. While we must agree that the contract does not enumerate any "objective" criteria that would be applied in reviewing advertisements, the contract is not ambiguous. On the contrary, the contract provides unambiguously that CBS may make a personal and subjective determination.

**2.** Defendant claims that plaintiff has failed to allege these damages in his complaint, but has only prayed for a recovery of the lost profits resulting from defendant's breach. Under F.R. Civ.P. 15(a), we will allow plaintiff to amend his complaint to reflect his prayer for reliance damages.

**3.** Plaintiff also argues that LaFountaine's ignorance of the CBS guidelines and her failure to inform Hons of their contents also constitutes

bad faith. Defendant responds that because LaFountaine was not required to familiarize herself these guidelines, she could not have acted in bad faith. We conclude that for the reasons stated in our estoppel and waiver analyses, a jury could find that if CBS created LaFountaine's apparent authority to pass on the initial suitability of the advertisement, LaFountaine's conduct could constitute bad faith.

Rather than applying some objective standard, we must uphold CBS's subjective determination so long as it was genuine. *See* 22 N.Y.Jur.2d *Contracts* § 294 (1982). *See also Action Engineering v. Martin Marietta Aluminum,* 670 F.2d 456, 460 (3d Cir.1982) ("While opinions may be analyzed by considering whether a reasonable person might share that opinion, that term itself does not imply any objective quality."). The existence of the policy guidelines makes clear that CBS genuinely rendered its determination. Furthermore, the policy itself appears to be a genuine reaction to the well-established and overwhelming objections not only to child-directed advertising in general, but also to the particular advertisements which encourage children to make "976" phone calls.

Much has been written on the detrimental social consequences of child-directed advertising. Most poignantly, many commentators have concluded that advertising to young children is inherently deceptive. Charren, *Commercial Speech and the First Amendment: Children's Advertising: Whose Hand Rocks the Cradle?,* 56 U.Cin.L.Rev. 1251, 1255 (1988) (hereinafter cited as Charren); Pauker, *The Case for FTC Regulation of Television Advertising Directed Toward Children,* 46 Brooklyn L.Rev. 513, 529 (1980) (hereinafter cited at Pauker); Note, *Unsafe for Little Ears? The Regulation of Broadcast Advertising to Children,* 25 U.C.L.A.L.Rev. 1131, 1140 (1978) (hereinafter cited as Little Ears). Such advertising is designed to exploit the limited maturity and experience of children: unlike advertisements directed at adults which provide information helpful in making a reasoned consumer decision, child-directed advertising takes advantage of a young child's limited reasoning capacity and his susceptibility to misleading advertising devices such as music, catch phrases, and familiar cartoon figures. Pauker at 514. Children view all that goes on in the world as real and concrete, and are unable to distinguish between fantasy and reality. *Id.* at 514–15; Little Ears at 1138. Therefore, they are unable to grasp the persuasive intentions of advertising, and because of their natural credulity, they implicitly trust and accept television advertisements and their messages. Note, *Children and the Recorded–Message Industry: The Need for a New Doctrine,* 72 Va.L. Rev. 1325, 1330 (1986) (hereinafter cited as New Doctrine); Pauker at 532. In the case at bar, with the figure of Santa Claus playing a prominent role in a young child's fantasy world, that child is without the capacity to make a real consumer judgment when Santa Claus urges him to call.

In response to the problems with child directed advertising, in 1978 the FTC proposed a ban on "all television advertising for any product which is directed to, or seen by, audiences composed of a significant proportion of children who are too young to understand the selling purpose of or otherwise comprehend or evaluate advertising." 43 Fed.Reg. at 17969 (1978). The Chairman of the FTC expressed his concern with advertising directed toward young children: "Television is a very, very powerful marketing tool. When it is directed toward children who can not even read, it raises the question: Is it fair for advertisers to treat children as consumers?" *U.S. News & World Report,* October 17, 1977 at 70. Similarly, in support of these concerns, the consumer group Action for Children's Television maintains the position that significant reforms in the area of child-directed advertising are necessary because "advertising to young children is inherently deceptive, children cannot understand the machinations of the marketplace, and they have difficulty figuring out the difference between editorial and commercial speech." Charren at 1252.

While the United States has not responded with significant restraints in the area of child-directed advertising, many other free nations have abridged or entirely prohibited children's television advertising. Codes in various countries have guarded against the potential for advertisements to encroach on the authority of parents, physically or emotionally endanger children, and to take advantage of the natural credulity and sense of loyalty of children. Powell, *Protection of Children in Broadcast and Advertising: The Regulatory Guidelines*

*of Nine Nations,* 26 Fed.Comm.B.J. 61, 63–64 (1973) (hereinafter cited as Powell). The New Zealand broadcasting code provides that commercial material is not acceptable which directly or by implication urges children to make unsuitable or costly purchases. *Id.* at 64. Ireland, Great Britain, and other nations prohibit advertisements that suggest that if the children do not buy the product or service they will be failing in some duty or lacking in loyalty toward some person. The Netherlands' code forbids any advertising that would " 'take advantage of the ignorance ... of children.' " *Id.*

Despite the absence of such stringent regulations in the United States, one could argue that child-directed advertising in general and Dial Santa advertising in particular is abhorrent to established American legal principles. For example, because a child can not make a considered buying judgment, and because he is at an enormously unequal bargaining position in the face of sophisticated modern advertising, drawing a child into a decision to "dial Santa" is inviting an unconscionable contract. Pauker at 525. In addition, the "976" service could be considered an "attractive nuisance: an adult possesses a device to which a naive child may be drawn, even where explicitly uninvited—a device that involves costs that the child may not understand." New Doctrine at 1334. Finally, and perhaps most relevant in the face of the studies addressing the deceptive nature of these advertisements, the United States Code declares unlawful "unfair or deceptive acts or practices in or affecting commerce...." 15 U.S.C. § 45.

In the case at bar, plaintiff has answered the criticisms of his advertisement first by pointing out that his ad explains that the call costs money and that child should get parental permission before placing the call. Naturally, however, children remain free to place the call without parental guidance. Especially in situations where both parents must work, children are often left unsupervised and can immediately and impulsively dial a recorded message. New Doctrine at 1330. n. 38, 1339. Plaintiff belies his concern that children obtain parental permission before calling Santa by scheduling his advertisements to air during Saturday morning—a time when it is quite likely that children are unsupervised. With regard to price information, given a child's unsophisticated understanding of both the telephone's billing system and his parent's financial situation, the price information is practically irrelevant, posing no real barrier to desire. New Doctrine at 1331.

Plaintiff also argues that CBS should not have rejected his advertisement because it includes a money-back guarantee. While this feature could perhaps decrease the expense to parents who have knowledge of and take advantage of the offer, it does not change what many have perceived as the essential deception that remains implicit in the advertisement. From the reasonable perspective of a broadcaster who finds such advertisements bereft of social value and not in the public interest[4], the guarantee certainly does not endow the advertisement with merit.

In sum, this discussion should make clear that CBS's decision to reject the Dial Santa advertisement is a genuine response to a well documented social problem. However, for the reasons adduced above, we are unable to grant summary judgment in favor of CBS. There remain genuine issues of material fact that at this early stage of the proceedings, call into question the enforceability of the literal terms of the contract.

An appropriate Order follows.

### ORDER

AND NOW, this 25th day of July, 1989, upon consideration of MOTION FOR SUMMARY JUDGMENT, filed by defendant on May 22, 1989, RESPONSE thereto, filed by plaintiff on June 20, 1989, and any successive responses, it is hereby ORDERED that Defendant's motion is Denied. It is further ORDERED that plaintiff amend his

---

4. As a user of public airwaves, the broadcaster is expected to operate in the public interest. *See* 47 U.S.C. § 309(a).

complaint to reflect the relief requested in his brief within 10 days of the date of this Order.