**WOLFF & MUNIER, INC., Plaintiff–Appellant–Cross–Appellee,**

v.

**The WHITING–TURNER CONTRACTING COMPANY, Defendant–Appellee–Cross–Appellant.**

**Nos. 1888, 1889, Dockets 91–7378, 91–7380.**

United States Court of Appeals, Second Circuit.

Argued Aug. 12, 1991.

Decided Oct. 15, 1991.

1004

James S. Morris, Greenwich, Conn. (O'Connor, Morris & Jones, of counsel), for plaintiff-appellant-cross-appellee.

Judith F. Herman, White Plains, N.Y. (Braude & Margulies, of counsel) for defendant-appellee-cross-appellant.

Before MINER, WALKER and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York following a non-jury trial before Judge Goettel. A subcontractor, Wolff & Munier, Inc. ("W & M"), sued the general contractor, Whiting–Turner Contracting Company for breach of contract. The general contractor counterclaimed for breach of contract. The trial court awarded $114,000 to the general contractor on its counterclaim, although Judge Goettel found that both parties had breached the contract. Whiting–Turner, the general contractor, now contends that it was entitled to a larger recovery. W & M, the subcontractor, maintains that it did not breach the contract and that it was entitled to damages caused by the general contractor's breach.

## BACKGROUND

In March 1986, Whiting–Turner, as general contractor, contracted with IBM (the "Prime Contract") to construct the IBM Customer Executive Center (the "Center") in Rockland County, New York, for $68.9 million. Work on the Center, to consist of six buildings, was to be completed by October 1988. Whiting–Turner and W & M, a mechanical subcontractor, executed a written subcontract (the "Subcontract") dated December 1, 1986 for $10,477,000. The contract price was later increased to $11,063,000.

### Project Delays

Almost from the day ground was broken, W & M encountered costly delays because of difficulties with the concrete work at the Center. First, Whiting–Turner's concrete subcontractor, Prim–Mar/S & L Joint Venture ("Prim–Mar"), reduced its manpower by one-third until March 1987 while it haggled over a new contract. For most of the next year, Prim–Mar complicated and delayed the project until Whiting–Turner finally terminated Prim–Mar in February 1988. Because of this contretemps with the concrete subcontractor, the concrete work was not completed until May 1988, a mere two months before W & M was supposed to have substantially completed the mechanical work.

Bad as these delays were, they were aggravated by Whiting–Turner's decision to revise the sequence of the concrete work.[1] Whiting–Turner's initial specifications called for completion of concrete slab on grade before pouring slab on the upper floors of the three concrete buildings planned for the Center. Whiting–Turner subsequently decided to reverse the sequence by pouring concrete on the upper floors before laying the slab on grade. This change was significant for two reasons: first, it delayed W & M's mechanical work and, second, it made W & M's work less efficient inasmuch as most of its work required there to be slab on grade.

W & M was well aware of the consequences of these developments as early as March 31, 1987, when it notified Whiting–Turner that it reserved the right to seek compensation for delays—and attendant costs—occasioned through no fault of its own. One year later, after Prim–Mar was finally replaced, the parties met to discuss W & M's request for an additional $500,000. This sum represented W & M's estimate of what it would now cost to accelerate the job in order to comply substantially with the original September 30, 1988 completion date. Whiting–Turner refused this request.

---

1. Although Whiting–Turner reached this decision in November 1986, it appears from the Record that Whiting–Turner did not notify W & M of it until March 1987 when Whiting–Turner distributed a revised schedule for completion of the concrete work.

Although the district court found that the project delays were primarily attributable to Whiting–Turner and its other subcontractors, W & M, itself, was not without fault and, in fact, contributed to its own problems. For example, its construction of the mechanical and electrical rooms took longer than anticipated, a problem that W & M exacerbated by failing to get an adequate supply of sheet metal for the project.

### The October, 1988 Agreement

By autumn 1988, both parties had become seriously concerned: Whiting–Turner that the project be completed, W & M that it be fairly compensated for delays and acceleration costs occasioned by the concrete fiasco. On October 5, 1988, they met again to discuss the situation. Whiting–Turner agreed to pay W & M the outstanding contract balance in twelve weekly installments of $106,000. In return, W & M agreed to continue working during this period. Both parties anticipated that the mechanical work would be substantially complete by year end, 1988.

Although the parties could not resolve their differences regarding W & M's claims for delays and acceleration, they did agree to meet regularly in an effort to settle this dispute. To that end, they agreed that W & M would submit data to support its claim that it was incurring increased costs because of the project delays and acceleration. W & M subsequently supplied Whiting–Turner with information about its losses. Whiting–Turner, however, found the data submitted insufficient to establish a causal relationship between the losses claimed and the problems for which Whiting–Turner was responsible (e.g., the concrete fiasco).

Despite the parties' discussions and meetings through October and November, 1988, they remained at loggerheads over W & M's claims. Indeed, autumn merely foreshadowed a winter of discontent, as December brought further deterioration of their relationship.

### Disintegration of the Parties' Relationship

On December 1, 1988, Whiting–Turner complained that W & M was going too slowly on the project. Whiting–Turner attributed this to W & M's reduction of manpower on the job, from an average of 60 workers per day in October to 30 by December. Whiting–Turner thus determined to make six weekly payments of $63,000 (for a total of $378,000) in lieu of the four weekly payments of $106,000 (for a total of $424,000) due pursuant to the earlier agreement of October 5. W & M, of course, vigorously objected and Whiting–Turner backed down. It continued to make the $106,000 payments as they became due.

On December 15, W & M requested that the parties meet for a final summit conference on December 27 to resolve their differences. Whiting–Turner agreed and, several days prior to the meeting, W & M submitted an estimate of $2,215,000 for extra costs it claimed to have incurred from delays, acceleration costs and other hardships caused by Whiting–Turner over the course of the project.

At the December 27 meeting, W & M handed an ultimatum to Whiting–Turner: *either* pay an additional $1,272,000 in twelve weekly installments of $106,000, the money to be applied toward W & M's claim for additional compensation *or* agree to expedited binding arbitration.[2] Otherwise, W & M would have to take "appropriate measures" to protect itself, the obvious implication being that W & M would walk away from the IBM project. Whiting–Turner flatly rejected W & M's "offer."

The following day, December 28, Whiting–Turner declared W & M in default[3]; and it demanded an express assurance that W & M would continue on the job. In the same communication, Whiting–Turner also agreed to pay the outstanding contract balance of $126,000, which included the final weekly payment of $106,000. Moreover, Whiting–Turner expressed its willingness to keep the lines of communication open and to consider W & M's claims if W & M

---

**2.** It should be noted that the Subcontract did not contain any arbitration clause.

**3.** This declaration of default triggered the Subcontract's two-day cure period.

would provide better data to support its claims.

W & M responded the same day, reiterating its either-or demand for additional payments or arbitration. W & M responded to Whiting–Turner's demand for assurances by asserting that "we have no alternative but to continue on a schedule determined by us to achieve completion of our work in the least expensive manner to us, while a resolution of our differences is sought."

On December 28, Whiting–Turner also learned that W & M had served their workers on the IBM project with a 24–hour layoff notice. The following day, W & M reduced its manpower from 32 to 4 workers. In response, Whiting–Turner sent a second default notice to W & M, demanding that it supply "a sufficient number of workmen so as to insure compliance with Whiting–Turner's schedule."

After a telephone conference on January 3, 1989, W & M wrote:

we are presently willing to proceed with the completion of our subcontract, with a completion date of March 31, 1989 ... upon prompt payment to us of the sums which were due on December 20 and 27, 1988 and upon your agreement to pay us $95,000 per week for twelve weeks against the determination of the final amount due on the Wolff & Munier subcontract, reflecting base contract, change orders, extras, and other excess costs incurred by us. We would be agreeable to arbitration of the balance due, net of the weekly payments during the next three months.

As Judge Goettel observed, this January 3rd "offer" actually *increased* W & M's demands. Whereas it had previously sought either payments *or* arbitration, it now sought both. Whiting–Turner gave up all hope of satisfying W & M and, accordingly, on January 3, 1989, it terminated the Subcontract and arranged to have the unfinished mechanical work completed by someone else. This litigation quickly ensued.

## DISCUSSION

All parties agree that New York law applies in this diversity case. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.,* 859 F.2d 242, 247 (2d Cir.1988). We turn first to consider the liability issues and then to examine the more troublesome damages questions.

### I. *Liability Determinations*

#### A. Plaintiff's Claims

■ W & M contends, and Judge Goettel found, that Whiting–Turner breached the Subcontract by reason of the delays and acceleration costs for which Whiting–Turner was ultimately responsible. To establish such a breach, W & M must demonstrate that, in contravention of the terms of the contract, Whiting–Turner caused a substantial delay in W & M's performance. *See S. Leo Harmonay, Inc. v. Binks Mfg. Co.,* 597 F.Supp. 1014, 1026 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d Cir.1985); *Quaker–Empire Constr. Co. v. D.A. Collins Constr. Co.,* 88 A.D.2d 1043, 1043, 452 N.Y.S.2d 692, 693–94 (3d Dept.1982).

■ Under New York law, each party to a construction contract impliedly agrees "not to hinder or obstruct [the other's] performance." *Quaker–Empire,* 88 A.D.2d at 1044, 452 N.Y.S.2d at 694; *see also Shalman v. Board of Educ.,* 31 A.D.2d 338, 341, 297 N.Y.S.2d 1000, 1003 (3d Dept.1969) ("[employer] impliedly agrees that the contractor will not be unreasonably delayed by the failure of other contractors to perform work which is essential to the performance of the work in question"). Indeed, each party has an affirmative obligation to facilitate the other's performance. *See Savin Bros., Inc. v. State,* 62 A.D.2d 511, 516, 405 N.Y.S.2d 516, 519–20 (4th Dept.1978), *aff'd,* 47 N.Y.2d 934, 419 N.Y.S.2d 969, 393 N.E.2d 1041 (1979).

■ Of course, contracting parties may expressly limit their liability for delay damages arising from breaches of this implied covenant. *See Corinno Civetta Constr. Corp. v. City of New York,* 67 N.Y.2d 297, 309, 502 N.Y.S.2d 681, 685–86,

493 N.E.2d 905, 909–10 (1986). Whiting–Turner argues that there is such a limitation here because the Subcontract excluded recovery for delay damages when it incorporated the Prime Contract's "no-damage-for-delay" clause.[4] Judge Goettel, citing *Harmonay, supra,* held that incorporation by reference of a "no-damages-for-delay" clause that appears in the prime contract is insufficient to bar a subcontractor from recovering delay damages. *Harmonay,* like the instant case, concerned the application to a subcontract of a no-damage-for-delay clause in a prime contract. *See Harmonay,* 597 F.Supp. at 1024–28. Although the incorporation clause here is more specific than the one in *Harmonay,* it is still not specific enough to negate Whiting–Turner's implied obligation to afford W & M a reasonable opportunity to perform the Subcontract without obstruction or interference.[5] *See Forward Indus., Inc. v. Rolm of New York Corp.,* 123 A.D.2d 374, 375–76, 506 N.Y.S.2d 453, 454–55 (2d Dept. 1986); *Shalman,* 31 A.D.2d at 341–42, 297 N.Y.S.2d at 1003. Exculpatory clauses of this kind are strictly construed against the party seeking an exemption from the damages it has caused. *See Ippolito–Lutz, Inc. v. Cohoes Hous. Auth.,* 22 A.D.2d 990, 990, 254 N.Y.S.2d 783, 784 (3d Dept.1964).

Understanding that Whiting–Turner, as general contractor, may be liable for delay damages it caused to its subcontractor, W & M, we turn to the district court's analysis of Whiting–Turner's liability. Judge Goettel found that W & M experienced substantial excess costs as a result of considerable, unanticipated and unjustified delays and complications arising from difficulties with the concrete work. These findings are amply supported by the record and establish a material breach by Whiting–Turner of its obligation to W & M. *See Quaker–Empire,* 88 A.D.2d at 1044, 452 N.Y.S.2d at 693–94. Accordingly, they will not be disturbed on appeal. *See United States ex rel. N. Maltese & Sons, Inc. v. Juno Constr. Corp.,* 759 F.2d 253, 255 (2d Cir.1985).

**B. Defendant's Counterclaims**

Defendant, Whiting–Turner, contends that W & M's actions between December 1988 and January 3, 1989 constituted a constructive abandonment of the IBM project and were breach of the Subcontract. W & M counters (1) that it was entitled to stop working until Whiting–Turner made the final weekly payment; (2) that Judge Goettel's finding of constructive abandonment by W & M was erroneous; and (3) that Whiting–Turner's termination letter of January 3, 1989 was premature and, therefore, constituted a breach of the Subcontract.

Whether a contract has been abandoned is a question of fact, *see Rothko v. Reis,* 43 N.Y.2d 305, 324, 401 N.Y.S.2d 449, 457, 372 N.E.2d 291, 298–99 (1977), and cannot be disturbed on appeal from a bench trial unless clearly erroneous. Judge Goettel concluded that W & M's high-handed demands for arbitration or additional payments as a condition for completion of its work, coupled with its sudden, drastic reduction of manpower on the job, established that W & M had constructively abandoned the project. *See, e.g., Brockhurst v. Ryan,* 2 Misc.2d 747, 750, 146 N.Y.S.2d 386, 390 (Sup.Ct.N.Y.Cty.1955) ("court may ... infer such abandonment from the conduct of the parties and the attendant circumstances"). This finding is abundantly supported by the record.

W & M's contention that Whiting–Turner's failure to pay the $126,000 contract balance justified its action in late December 1988 and early 1989 is similarly without merit. Even if we were to assume, without deciding, that W & M was entitled to the

---

**4.** The Prime Contract provides: "The Contractor [Whiting–Turner] hereby expressly assumes the risk of all excusable delays to the work, and waives all claims for damages or additional payment for delays to the work."

**5.** This is not to say that a subcontract can never bar damages for delay through incorporation of the terms of the prime contract or otherwise. To accomplish this result, however, such a clause must be express and unambiguous. *See Forward Indus., Inc. v. Rolm of New York Corp.,* 123 A.D.2d 374, 376, 506 N.Y.S.2d 453, 454–55 (2d Dept.1986).

remaining contract balance of $126,000 on December 28, 1988, Whiting–Turner's failure to pay on that date would not justify W & M's abandoning the project unceremoniously. *See Tri–Mar Contractors, Inc. v. ITCO Dry–Wall, Inc.*, 74 A.D.2d 601, 602, 424 N.Y.S.2d 737, 739 (2d Dept.1980). Thus, W & M's precipitate abandonment of the project constituted a material breach of the contract, entitling Whiting–Turner to elect to terminate the contract.

■ Finally, W & M's contention that Whiting–Turner's termination letter of January 3, 1989 was premature, and therefore constituted a breach of the Subcontract, is rejected. It is true that under Article 7 of the Subcontract, Whiting–Turner was required to give W & M two-days' notice to cure any alleged defaults. There is some question whether the two-day cure period applies in this case,[6] but, assuming that it does, we conclude that W & M waived it.

■ Waiver is "an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed." *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 37, 118 N.E. 210 (1917); *see also Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 355–56, 429 N.Y.S.2d 715, 718–19 (2d Dept.1980). The Subcontract's cure proviso, like any other contractual provision, "may be waived by implication or express intention of the party for whose benefit the provision inures." *In re Gordon Car & Truck Rental, Inc.*, 59 B.R. 956, 962 (Bankr. N.D.N.Y.1985). W & M's actions between December 28, 1988 and January 3, 1989 make plain that it had no intention to complete its work unless and until Whiting–Turner acceded to its (unjustified) demands. Accordingly, W & M should be deemed to have waived the Subcontract's two-day cure provision.

Even if W & M's intention to waive this contractual term was not manifest, Whiting–Turner would be excused from performing a futile act. In a similar case, the Ninth Circuit, applying Arizona law, recently held that compliance with a two-day notice provision is not required where it would amount to a "useless gesture." *L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 232 (9th Cir.1989) (citing 2 Corbin on Contracts § 1266, at 442 (C. Kaufman Supp.1984)); *see also Craddock v. Greenhut Constr. Co., Inc.*, 423 F.2d 111, 115 (5th Cir.1970) (contractual condition excused where it "was a useless gesture") (applying Florida law). New York is in accord, providing that "a party to a contract may be precluded from insisting on strict compliance by conduct amounting to a waiver or estoppel." *Peter A. Camilli & Sons, Inc. v. State*, 41 Misc.2d 218, 223, 245 N.Y.S.2d 521, 527 (Ct.Cl.1963); *see also Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 135 A.D.2d 891, 892, 522 N.Y.S.2d 292, 293 (3d Dept.1987) ("where it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent"). The record amply supports Judge Goettel's finding that strict adherence to the Subcontract's two-day cure provision would have been a "useless act" in the face of W & M's abandonment of the job and its unjustified ultimatums. Accordingly, Judge Goettel's conclusion that compliance with the cure provision would be futile, and should thus be excused, must be affirmed.

In sum, Judge Goettel's findings regarding liability of the parties for breach of the Subcontract cannot be characterized as clearly erroneous and, therefore, are affirmed.

## II. *Damages*

■ Having affirmed the district court's findings regarding liability, we turn now to its determination of damages. Although the amount of recoverable damages is a question of fact, "the measure of damages upon which the factual computation is based is a question of law." *United States ex rel. Juno Constr. Corp.*, 759 F.2d 253,

---

**6.** Whiting–Turner argues that the two-day cure period may be disregarded pursuant to Article 7 of the Subcontract because the project was endangered by W & M's abandonment.

255 (2d Cir.1985). Because we find that the district court utilized improper measures of damages under New York law, we reverse that portion of the decision and remand for further proceedings.

### A. W & M's Delay Damages

■ Both parties contend that the district court erred in its determination of W & M's delay damages by relying upon W & M's March 1988 offer to accept $500,000 in acceleration costs from Whiting–Turner. We agree. This offer of compromise was made nine months before W & M abandoned the project and before the full extent of its damages could be ascertained. Moreover, this offer did not purport to represent the full extent of W & M's damages, nor was it substantiated by competent proof of damages. In short, this figure was "essentially an unreliable approximation" of W & M's damages upon which the district court should not have relied in computing damages.[7] *Novak & Co., Inc. v. Facilities Dev. Corp.*, 116 A.D.2d 891, 892, 498 N.Y.S.2d 492, 494 (3d Dept.1986).

■ Although a party is not to be denied damages when they are necessarily uncertain, *see Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 687, 412 N.Y.S.2d 589, 591, 385 N.E.2d 281, 283 (1978), New York law does not countenance damage awards based on "[s]peculation or conjecture." *Id.* W & M's March 1988 approximation evidently represented its best estimate as to what it would cost to complete the job on an accelerated basis. As such, its estimation was no more reliable than a contractor's bid estimates, the "inherent unreliability" of which preclude their use in calculating damages. *Novak & Co.*, 116 A.D.2d at 892, 498 N.Y.S.2d at 494; *see also Najjar Indus., Inc. v. City of New York*, 87 A.D.2d 329, 332, 451 N.Y.S.2d 410, 413 (1st Dept.1982); *Columbia Asphalt Corp. v. State*, 70 A.D.2d 133, 136, 420 N.Y.S.2d 36, 38 (3d Dept.1979).

■ There is no doubt that W & M, as the mechanical subcontractor, experienced substantial cost overruns on the IBM project. The issue on remand will be the extent to which Whiting–Turner, as general contractor, is answerable for these cost overruns. Thus, W & M "must establish the extent to which its costs were increased by [Whiting–Turner's] improper acts because its recovery will be limited to damages *actually sustained.*" *Berley Indus.*, 45 N.Y.2d at 687, 412 N.Y.S.2d at 591 (emphasis added).

This will require the district court first to ascertain W & M's total delay damages. These are the difference between the contract price set by W & M to do the mechanical work and W & M's total job costs, including overhead and profits, if applicable. *See Columbia Asphalt*, 70 A.D.2d at 136–37, 420 N.Y.S.2d at 38–39; *Whitmyer Bros., Inc. v. State*, 63 A.D.2d 103, 108, 406 N.Y.S.2d 617, 620 (3d Dept.), *appeal dismissed*, 45 N.Y.2d 897, 411 N.Y.S.2d 9, 383 N.E.2d 561 (1978). The district court must then apportion the delay damages according to each party's responsibility for them. *See Columbia Asphalt*, 70 A.D.2d at 136–37, 420 N.Y.S.2d at 38–39; *Fehlhaber Corp. v. State*, 65 A.D.2d 119, 127–28, 410 N.Y.S.2d 920, 926 (3d Dept.1978). Thus, W & M cannot recover for costs occasioned by its own errors, either in performing the Subcontract or in preparing its bid and its underlying assumptions and projections. *See Novak & Co.*, 116 A.D.2d at 892, 498 N.Y.S.2d at 494.

### B. Whiting–Turner's Damages

The district court calculated the loss to Whiting–Turner when W & M abandoned the contract by limiting the damages to the reasonable cost of completing the mechanical work. It estimated this reasonable cost at $1,000,000. The district court then deducted from this amount the $126,000 unpaid balance owed to W & M on the contract and $10,000 for tools W & M lost when it was unable to recover the tools from the job site. The district court deducted another $200,000 to reflect "the ex-

---

**7.** The district court's unexplained addition of $50,000 to this figure suffers from the same defect.

tent to which the plaintiff's damages would have increased had it completed the job itself."

Whiting–Turner contends that the district court erred (1) by estimating a mystical "reasonable" cost to complete the work rather than accepting its actual cost to complete the job and (2) by deducting $200,-000 for "damages saved" by Whiting–Turner. We agree.

### 1. Completion Costs

■ It was error for the district court to award damages based on its estimation of the reasonable cost to complete the job instead of accepting Whiting–Turner's actual costs of completion, which the district court found was $1,741,866. *See L.G. Defelice & Sons v. Globe Indem. Co.*, 189 F.Supp. 455, 459–60 (S.D.N.Y.1960); Restatement (Second) Contracts § 348 comment c; *cf.* 3 E. Farnsworth, Contracts 233 (1990) ("as long as ... the injured buyer covers 'by making in good faith, a 'reasonable purchase or contract to purchase,' the injured party can recover based on actual loss, regardless of the market price") (footnotes omitted).

Article 7(a) of the Subcontract provides that, in the event of W & M's breach, Whiting–Turner "may make independent arrangements for completion of the job. The amount of completion cost ... incurred as a result of such default shall be charged against any unpaid balance due the Subcontractor ... and, if said total costs, damages or expenses shall exceed the balance due, the Subcontractor agrees to pay the amount of said excess...." This contractual damages provision is consistent with New York law:

> The proper measure of damages in a case such as this, where the contractor walked off the job after completing only a portion of the work required by his agreement is the difference between the contract price and the cost of completing the work left undone. In practical application, however, the rule of damages is more clearly and appropriately stated to be the difference between the amount remaining due and owing under the origi-

nal agreement and the actual cost of completing the work required by the contract.

*Sarnelli v. Curzio*, 104 A.D.2d 552, 553, 479 N.Y.S.2d 257, 258 (2d Dept.1984) (citations omitted); *accord Manniello v. Dea*, 92 A.D.2d 426, 428, 461 N.Y.S.2d 582, 584–85 (3d Dept.1983); *Condello v. Stock*, 285 A.D. 861, 861, 136 N.Y.S.2d 507, 508 (4th Dept.1955). Accordingly, absent fraud, overreaching, or other evidence of bad faith, Whiting–Turner should be awarded its actual costs to complete the mechanical work, less the $126,000 remaining contract balance and the $10,000 offset for tools.

### 2. $200,000 Offset

■ The remaining issue concerns the propriety of the district court's offset of $200,000 against Whiting–Turner's damages. The district court essentially determined that, if W & M had completed the job, its delay damages, for which Whiting–Turner was liable, would have grown by approximately $200,000. Thus, W & M actually "saved" Whiting–Turner $200,000 by abandoning the job. Accordingly, the district court reasoned, Whiting–Turner's damages should be offset by this $200,000 "savings."

Although this approach may hold some visceral appeal, *cf. Al–Ev Constr. Corp. v. Ahern Maintenance & Supply Corp.*, 141 A.D.2d 591, 593, 529 N.Y.S.2d 354, 356 (2d Dept.1988) (in computing damages for cost of completing a contractor's work, "the trial court should have taken into consideration the cost the defendant [ ] avoided as a result of not having to complete the contract with the plaintiff"), it does not accord with New York law. Giving W & M a credit for the amount by which W & M's damages would have increased had W & M completed the job, perforce rewards W & M for its own breach. Having elected to continue with the contract after Whiting–Turner's breach, W & M was bound to comply with it or be itself liable for breach. *See Thuman v. Clawson & Wilson Co.*, 211 A.D. 507, 510, 207 N.Y.S. 565, 569 (4th Dept.1925). Having itself breached the contract, W & M should not now be heard

to boast that it saved Whiting–Turner money that Whiting–Turner would have had to pay if W & M had completed the IBM project.

While Whiting–Turner could not recover for *costs* it truly avoided by virtue of W & M's breach, *see Al–Ev Constr.*, 141 A.D.2d at 593, 529 N.Y.S.2d at 356; *Sarnelli*, 104 A.D.2d at 553, 479 N.Y.S.2d at 258. *See generally*, 3 E. Farnsworth, *supra*, at 200–02 (discussing reduction of damages for costs and losses avoided), W & M cannot recover for "damages" it never incurred because of its own breach. Because it abandoned the contract on December 28, 1988, W & M cannot recover or be credited for "damages" it would have suffered after that date; not having incurred them, they manifestly are not damages and therefore cannot provide a basis for recovery. *See generally* 3 E. Farnsworth, *supra*, at 196–218 (compensatory damages awarded for actual economic gains and losses).

Even assuming *arguendo* that "damages saved" could, in theory, properly offset Whiting–Turner's damages, the amount of such an offset would be so speculative as to constitute an improper basis for awarding damages. *See Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 687, 412 N.Y.S.2d 589, 591, 385 N.E.2d 281, 283 (1978). As this case amply demonstrates, fixing an award for delay damages actually incurred can be a herculean task. Settling on an amount of "future" delay damages which might have been incurred had W & M completed the job is a bootless exercise. In any event, such an exercise lacks the requisite certainty and basis in fact upon which damage awards must be based under New York law. *See id.; see also Griffin v. Colver*, 16 N.Y. 489, 491 (1858) (damages must "be shown with certainty, and not left to speculation or conjecture"); Restatement (Second) Contracts § 352.

### C. Attorney's Fees

 Had only W & M breached the Subcontract we would agree with Whiting–Turner that the agreement entitled it to recover its attorney's fees for this litigation. Whiting–Turner, however, breached the contract as well. Indeed, although W & M was legally unjustified in abandoning the project, there is little doubt that, as a factual matter, Whiting–Turner's initial breach of the Subcontract precipitated both W & M's breach and this lawsuit. Accordingly, Judge Goettel properly denied Whiting–Turner's claim for attorney's fees. *See Equitable Lumber Corp. v. IPA Land Dev. Corp.*, 38 N.Y.2d 516, 523–24, 381 N.Y.S.2d 459, 464, 344 N.E.2d 391, 396–97 (1976).

### CONCLUSION

In sum, we hold that the district court properly determined that both W & M and Whiting–Turner breached the Subcontract. Because the district court's award of damages was not in accordance with New York law, we remand that portion of the case for recalculation of damages in accordance with the principles set forth in this opinion.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.