J. Daniel LUGOSCH III and Peter Steingraber, as General Partners of Providence Place Group and Providence Place Group, LLC

v.

Alexius C. CONROY, Providence Place, Inc. and the Conroy Development Company, Inc.

C.A. No. 97–492.

United States District Court, D. Rhode Island.

Nov. 6, 1997.

George E. Lieberman, Licht & Seminoff, Providence, RI, Gael Mahoney, Bruce E. Falby, Hill & Barlow, Boston, MA, for Plaintiffs.

Joseph V. Cavanagh, Jr., Karen Ann Pelczarski, Blish & Cavanagh, Providence, RI, Bud G. Holman, Paul F. Doyle, Kelley, Drye & Warren, LLP, New York City, for Defendants.

### MEMORANDUM OF DECISION

TORRES, District Judge.

J. Daniel Lugosch, III, Peter Steingraber, and Providence Place Group, LLC ("Lugosch plaintiffs") seek a declaratory judgment to the effect that Lugosch's purchase of Robert Congel's general partnership interest in Providence Place Group ("PPG") did not violate the transfer restrictions, representations or warranties contained in an October 13, 1989, agreement (the "1989 Agreement") among Lugosch, Congel and defendant, Alexius C. Conroy.

### Background

The background facts are undisputed and are set forth in this Court's contemporaneous Memorandum and Order with respect to a related motion for summary judgment. (See J. Daniel Lugosch III and Peter Steingraber, as General Partners of Providence Place Group and Providence Place Group, LLC v. Alexius C. Conroy, Providence Place, Inc. and the Conroy Development Company, Inc., C.A. No. 97–492 Memorandum and Order dated November 6, 1997.) For present purposes, those facts may be summarized as follows.

In 1989, Conroy, through Providence Place, Inc. ("PP"), a corporation that he controlled, held options to purchase land in the city of Providence (the "site") In October of that year, Conroy and PP entered into an agreement (the "1989 Agreement") with PPG, also referred to as "Pyramid," a general partnership in which Congel and Lugosch were the general partners. The gist of the agreement was that, in exchange for the sum

of $8 million, PP would assign its options to a limited partnership (the "Retail Venture Limited Partnership") to be formed between PPG, as the general partner, and Conroy, as a limited partner. PPG was to have a 90% interest in the partnership and Conroy was to have a 10% interest. The purpose of that partnership was to develop a retail shopping mall on the site.

The 1989 Agreement also provided for the formation of a second limited partnership (the "Office Venture Limited Partnership") that later would have the right to construct an office tower and, perhaps, an hotel on top of the buildings housing the retail stores. The parties' roles in this second limited partnership were reversed. Conroy was to be the general partner with a 90% interest and PPG was to be a limited partner with a 10% interest.

By 1996, Congel, who up until then had provided most of the money, began experiencing cash flow problems and became disenchanted with the project. In February 1997, Congel sold his general partnership interest in PPG to Lugosch. At the same time, Lugosch and Steingraber, who had previously formed a limited partnership called Providence Place Group Limited Partnership ("PPGLP") as the entity to complete the Retail Project,[1] entered into a "financing" agreement with Nomura Asset Capital Corporation ("Nomura").

The subject of this trial is Conroy's claim that Lugosch's purchase of Congel's interest in PPG violates the transfer restrictions, representations and warranties contained in the 1989 Agreement. More specifically, Conroy relies on a provision in the 1989 Agreement that prohibits transfers of ownership interests in Pyramid that divest Pyramid's "Key Partners" of control over Pyramid. Conroy contends that the term "Key Partners" refers to both Lugosch and Congel.

The Lugosch plaintiffs seek a declaratory judgment in their favor with respect to Conroy's claim. The arguments that they make are:

1. That the term "Key Partners," as used in the 1989 Agreement, refers to either Congel or Lugosch.

2. Even if the 1989 Agreement, as originally written, is not construed in that manner, it, subsequently, was modified by the parties to permit Lugosch's purchase of Congel's interest.

3. That Conroy waived or is estopped from asserting any right that he may have had to object to the Congel buy out.

4. That, in any event, Conroy's claim must fail because he did not sustain any damages as a result of the buy out.

The first and last arguments will be addressed at the outset because they can be disposed of rather summarily. The second and third arguments turn on the facts developed at trial and will be addressed in that context.

### The 1989 Agreement

■ The first step in ascertaining the meaning of the transfer restrictions imposed by the 1989 Agreement is to examine the agreement itself. If those provisions are clear and unambiguous, the inquiry ends there and the provisions must be applied as written. *W.W.W. Assocs., Inc. v. Gianconti-eri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 444, 566 N.E.2d 639, 642 (1990). If an ambiguity exists, extrinsic evidence may be considered to ascertain the intent of the parties. *Kaila-sanathan v. Mysorekar,* 234 A.D.2d 425, 651 N.Y.S.2d 124, 125 (1996); *Mercury Bay Boating Club Inc. v. San Diego Yacht Club,* 76 N.Y.2d 256, 557 N.Y.S.2d 851, 857, 557 N.E.2d 87, 93 (1990). Whether or not the provisions of an agreement are ambiguous is a question for the Court. *W.W.W. Assocs., Inc.,* 565 N.Y.S.2d at 444, 566 N.E.2d at 642; *Kailasanathan,* 651 N.Y.S.2d at 125.

■ The pertinent transfer restrictions, representations and warranties contained in the 1989 Agreement are set forth in II.5. and VII.A.1. Section II.5. provides:

Conroy, a 10% interest to which he was entitled under the terms of the 1989 Agreement.

---

1. Because of disagreements that developed, Conroy never signed the agreement creating PPGLP. Therefore, Lugosch and Steingraber reserved, for

Pyramid represents and warrants that it is a New York general partnership, that Robert J. Congel, of Fayetteville, New York and J. Daniel Lugosch, III of Dover, Massachusetts (the "Key Partners") are general partners of Pyramid, and that the Key Partners shall remain general partners notwithstanding any changes in composition of Pyramid, and that no assignment of Pyramid's interest hereunder shall release Pyramid, Robert J. Congel or J. Daniel Lugosch, III from liability hereunder.

Section VII.A.1. states:

Prior to the completion of construction of ... the Retail Project ... (ii) Pyramid shall not directly or indirectly transfer its interest in the Retail Project, provided that Pyramid may assign its interest in the Retail Project to any entity controlled by the Key Partners. *The foregoing prohibition shall also apply to direct or indirect transfers of ownership interests in ... Pyramid if, as a result of such transfer Pyramid ... ceases to be a person or entity satisfying the requirements stated in ... (ii), as applicable.*

(emphasis added).

These provisions are clear and unambiguous. Section VII.A.1. expressly prohibits the "transfer of 'ownership interests'" in ... Pyramid if, as a result of such transfer ... Pyramid ... ceases to be a person or entity satisfying the requirements stated in ... (ii) ." It is plain that an "entity satisfying the requirements stated in (ii)" refers to an "entity controlled by the Key Partners."

Here, there is no question that Congel transferred an ownership interest in Pyramid. However, the Lugosch plaintiffs contend that, after the transfer, Pyramid continued to be controlled by the "Key Partners" because that term refers to *either* Lugosch *or* Congel *or* to *both of them.* Such an interpretation is at variance with both the wording of the transfer restriction, itself, and the representations and warranties section of the agreement.

Section VII.A.1. refers to "Key Partners" in the *plural.* In addition, Section II.5. defines the term "Key Partners" as Congel *and* Lugosch. Moreover, in that section, it is represented and warranted that "the Key Partners shall remain general partners notwithstanding any changes in composition of Pyramid." (emphasis added). Thus, the only reasonable way in which to construe the term "Key Partners" is that it means *both* Lugosch *and* Congel.

### The Damages Argument

The Lugosch plaintiffs' argument that any breach of the 1989 Agreement is immaterial because Conroy sustained no damages as a result of the Congel buy out is flawed for several reasons. First and foremost, the question of what damages Conroy may have sustained is beyond the scope of this trial. In severing this aspect of the Lugosch plaintiffs' declaratory judgment request and accelerating it for trial, the Court limited the issues to be addressed in this phase of the case. Those issues were identified as: whether the Congel buy out violated the 1989 Agreement, as it may have been modified; and, if so, whether Conroy had waived or was estopped from asserting any right to, now, challenge the transfer. Since Conroy presumably relied on that specification of issues, it would be patently unfair to penalize him for any failure to present evidence of damages.

In addition, the Lugosch plaintiffs, argument ignores Conroy's contention that the transfer restriction had value to him because it insured the continued participation of Congel whose involvement Conroy considered important to the success of both the retail and office projects. Violation of such a provision in a bargained for exchange would not have to be accompanied by proof of monetary damages in order to be actionable.

### The Elements of Modification, Waiver and Estoppel

Because some of the elements of modification, waiver and estoppel are similar and because there is considerable overlapping of the facts required to prove those elements, the Court will address those arguments together. Inasmuch as the 1989 Agreement was amended to provide that it "shall be governed by the laws of the State of New York," New York law will be applied.

Under New York law, a written contract may be modified orally or by the acts and conduct of the parties. *Recon Car Corp. of New York v. Chrysler Corp.,* 130 A.D.2d 725, 515 N.Y.S.2d 829, 833 (1987); *Beacon Terminal Corp. v. Chemprene, Inc.,* 75 A.D.2d 350, 429 N.Y.S.2d 715, 718 (1980); *Bensen v. American Ultramar Ltd.,* No. 92 CIV.4420(KMW)(NRB), 1997 WL 66780, at *7 (S.D.N.Y. Feb. 14, 1997). A contract modification, like the formation of a contract, requires that each element necessary to the formation of a contract be proved. *Beacon Terminal Corp.,* 429 N.Y.S.2d at 718. These elements include mutual assent, consideration, and satisfaction of the statute of frauds. *Id.; Bensen,* at *7. The statute of frauds may be satisfied by either full or part performance. *T & N West Galla Pizzeria, Inc. v. CF White Plains Assocs.,* 185 A.D.2d 270, 586 N.Y.S.2d 266, 268 (1992); *Paper Corp. of the United States v. Schoeller Technical Papers, Inc.,* 724 F.Supp. 110, 117 (S.D.N.Y.1989).

The doctrine of estoppel prevents "the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 451 N.Y.S.2d 663, 667–68, 436 N.E.2d 1265, 1269 (1982). Estoppel "rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury." *Metropolitan Life Ins. Co. v. Childs Co.,* 230 N.Y. 285, 130 N.E. 295, 298 (1921); *see also Nassau Trust Co.,* 451 N.Y.S.2d 663, 436 N.E.2d at 1269; *Triple Cities Constr. Co. v. Maryland Cas. Co.,* 4 N.Y.2d 443, 176 N.Y.S.2d 292, 294–96, 151

N.E.2d 856, 858 (1958); *Commercial Credit Corp. v. Northern Westchester Bank,* 256 N.Y. 482, 177 N.E. 12, 14 (1931); *Dimacopoulos v. Consort Dev. Corp.,* 166 A.D.2d 631, 561 N.Y.S.2d 59, 60 (1990).[2]

Waiver is "the voluntary and intentional abandonment of a known right which,' but for the waiver, would have been enforceable." *Nassau Trust Co.,* 451 N.Y.S.2d at 668, 436 N.E.2d at 1269–70. A waiver need not be express, but may be implied through the words and conduct of a party. *Hadden v. Consolidated Edison Co. of New York, Inc.,* 45 N.Y.2d 466, 410 N.Y.S.2d 274, 275–76, 382 N.E.2d 1136, 1138 (1978).

### Findings of Fact

Bearing in mind the elements that the Lugosch plaintiffs must prove in order to prevail on their claims of modification, waiver and/or estoppel, the Court finds the relevant facts developed at trial to be as follows.

Conroy knew, long before February 21, 1997, that Congel was either unable or unwilling to continue financing the project, that he was frustrated with its lack of progress and that he wanted to sell his general partnership interest in PPG. In a series of telephone conversations and meetings that took place between early 1996 and February 1997, Lugosch and two of his associates, John Bersani and Richard Duggan, repeatedly informed Conroy that Congel was seriously considering selling his interest and "getting out" of the project. Conroy, himself, acknowledged that there were discussions about whether Congel was a "buyer or a seller." In fact, as early as February 8, 1996, Conroy wrote directly to Congel specifically inquiring whether Congel wanted "to get out of the project" and stating that, if he

2. There appears to be some conflict in New York case law over the elements of estoppel. Some cases state the elements to be as follows: that the party to be estopped (1) must have engaged in conduct which amounts to a false representation or concealment of material fact, (2) must have intended that such conduct be acted upon by the other party, and (3) must have had knowledge of the real facts; the party alleging estoppel then must prove (1) lack of knowledge as to the true facts, (2) reliance on the conduct of the other party, and (3) a prejudicial change in position. *See e.g., Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301–02 (2d Cir.1996). However, other cases make clear that estoppel does not require fraud or intentional deception. *See, e.g., Triple Cities Constr. Co.,* 176 N.Y.S.2d at 295, 151 N.E.2d at 858 ("Indeed, 'A party may not, even innocently, mislead an opponent and then claim the benefit of his deception.' ") *(quoting Romano v. Metropolitan Life Ins. Co.,* 271 N.Y. 288, 2 N.E.2d 661, 663 (1936)).

did, "I need to know." (Pls.' Ex. 15.) Conroy also conceded being told by Duggan, on September 12, 1996, that Congel was "still looking to sell his interest and be relieved of responsibility." (Pls.' Ex. 19.) His claim that he attached no significance to the statement and only recorded it in a memorandum that he made of the meeting because that was what Duggan said is simply not credible. The credibility of that explanation is further undermined by Conroy's deposition testimony in which he claimed to have understood that what Congel desired to sell was not his interest in the project but rather his interest in financing the project. In this connection, it is noteworthy that Conroy's deposition was taken before the deposition of Ira Kaplan, Vice President of Finance for the Conroy Company, in which Kaplan related that Conroy had told him Congel was looking to sell his interest. (Pls.' Ex. 34.)

Conroy also was aware that Lugosch was attempting to raise money in order to purchase Congel's interest. On several occasions, beginning in the late spring of 1996, Lugosch and Bersani specifically told Conroy that they were working on a final agreement to buy out Congel and that they were attempting to obtain the necessary financing. Moreover, Conroy acknowledges reviewing the 1989 Agreement's transfer restrictions in the spring of 1996. (*See* Pls.' Ex. 18.) It is reasonable to infer that the review was precipitated by knowledge of the possibility that Lugosch would purchase Congel's interest. Conroy's explanation that the review was motivated only by the possibility that a new equity partner would be found to help finance the project merely confirms his knowledge of the efforts being made to buy out Congel.

Conroy's awareness of those efforts and his endorsement of them are manifested in his letter to Lugosch dated November 25, 1996. (Pls.' Ex. 22.) That letter was sent immediately after a meeting in which Lugosch and Bersani discussed with Conroy their efforts to purchase Congel's interest. In the letter, Conroy states, "Clearly the resolution of Bob's [Congel's] participation in the project is the number one issue, and I

hope you are successful in resolving that with him this week."

Shortly before the Congel closing, Lugosch telephoned Conroy to tell him that financing to purchase Congel's interest had been obtained and that the closing was imminent. Conroy initially appeared to deny that Lugosch called him, but, after telephone records were produced confirming the call, he testified that, although the call may have been placed, the Congel buy out was not discussed.

The evidence of these communications contradicts Conroy's claim that Lugosch made a concerted effort to conceal his attempts to purchase Congel's interest. That claim also is inconsistent with the fact that Congel's anticipated exit from the project was the subject of several public hearings and was discussed freely with the media by Lugosch's spokesman. (Pls.' Ex. 23–26.)

Despite knowing of Lugosch's efforts to purchase Congel's interest, Conroy failed to object even though he was well aware of the transfer restrictions contained in the 1989 Agreement. As already noted, Conroy had reviewed the transfer restrictions in May of 1996. Nevertheless, he failed to raise any question regarding the proposed Congel buy out.

On the contrary, Conroy encouraged Lugosch's efforts and led Lugosch to reasonably believe that Conroy assented to the buy out. As evidenced by his February 8, 1996, letter to Congel and his November 25, 1996, letter to Lugosch, Conroy clearly was concerned about the progress of the project and the need to replace Congel if Congel was getting out. (Pls.' Ex. 15 and 22.) At their meeting in the late spring of 1996, Conroy urged Lugosch to finalize the Congel buy out agreement "as soon as possible." His desire to resolve Congel's "participation in the project" was reiterated in the November 25 letter.

The evidence that Conroy encouraged the purchase of Congel's interest and his replacement as a participant is corroborated both by the parties' contemporaneous negotiations regarding the terms of the Retail Venture limited partnership agreement and by events occurring after the Congel closing. Starting

in October 1989 counsel for Lugosch and Conroy, in, consultation with their respective clients, began exchanging drafts of the proposed limited partnership agreement. In contrast to the transfer restrictions contained in the 1989 Agreement, the first draft, prepared by Lugosch's counsel, contained a provision allowing PPG, as general partner, to transfer its interest to an entity "controlled by *either* Robert J. Congel *or* J. Daniel Lugosch III or by the two of them." (Pls.' Ex. 4.) (emphasis added). The response by Conroy's counsel not only fails to object to transfers of PPG's interest to entities controlled by *either* Lugosch *or* Congel; but, also, proposes the addition of a rider allowing the transfer of "ownership interests *in the general partner*" [i.e., PPG] as long as PPG continues to be "controlled by *either* or both of Robert J. Congel and J. Daniel Lugosch III." (Pls.' Ex. 5.) (emphasis added).

Later drafts exchanged in 1994 and 1995 contain similar provisions. For example, the second draft, received by Conroy on December 28, 1994, contains a provision allowing PPG to transfer its interest to an entity controlled by "Robert J. Congel and/or J. Daniel Lugosch III or any affiliate of *either* of them." (Pls.' Ex. 7.) (emphasis added). Although Conroy's attorney commented on the section in which that provision was contained, he did not object to that provision. (*See* Pls.' Ex. 12.) Subsequent modifications to the section also left the provision undisturbed. (*See* Pls.' Ex. 13 and 14.) Thus, contrary to Conroy's assertions, it is clear that Conroy was amenable to having the project continue without Congel's participation as long as Lugosch continued to be involved.

Conroy's attempts to minimize the significance of the draft limited partnership agreements on the ground that they were only "proposals" and that if the parties became "serious" about them, they would "bring in the lawyers" is not persuasive for two reasons. First, the drafts were not received in evidence for the purpose of proving the existence of a limited partnership agreement. Rather, they were received to corroborate the evidence that Conroy agreed to the Congel buy out and to rebut Conroy's contention

that he considered the buy out to be a violation of his rights. Secondly, the claim that Conroy and his representatives only proposed and approved the provisions in question because they were subject to change is patently incredible. The explanation that the "lawyers" could be brought in later to alter the provisions is equally incredible because the lawyers for both sides, as well as the parties themselves, were deeply involved in the preparation and revision of those drafts.

Further corroboration of Conroy's encouragement of and agreement to Lugosch's purchase of Congel's interest may be found in the events occurring after the Congel closing. In March 1997, Lugosch telephoned Conroy to inform him that the Congel transaction had been consummated and was congratulated by Conroy. Moreover, Conroy acknowledges receiving the documents relating to the Congel and Nomura transactions at the end of March 1997. Yet, at meetings attended by the parties and their counsel on May 1, 1997, and May 6, 1997, neither Conroy nor his attorney raised any question about the Congel buy out. It is difficult to accept the assertion that Conroy did object, partly because that was not confirmed by the counsel representing him at the meeting even though that counsel was present in the courtroom during the trial.

It is equally difficult to accept Conroy's testimony that he expressed his opposition by faxing to Lugosch, on February 27, 1997, a copy of a letter sent by Lugosch to Nordstrom's referring to the Congel buy out and on which Conroy made handwritten notes expressing surprise and disapproval. (Defs.' Ex. XX.) Conroy was unable to produce any confirmation that the fax had been sent even though he was able to produce a confirmation for at least one other fax emanating from his office. (*See* Pls.' Ex. 36.) In addition, faxing handwritten comments to Lugosch was a departure from Conroy's usual practice of limiting his written communications with Lugosch to more formal typewritten letters and/or memoranda. Conroy's attempt to explain this departure on the ground that he was very angry is undermined by the apparently cordial tone of a letter Conroy sent to Lugosch on March 13, 1997, shortly after he

says that he sent the fax. In that letter Conroy asks to see the documents relating to the Nomura transaction and, then, states:

I think we should have an acknowledgment from Nomura … that they will guarantee to perform and undertake the responsibilities currently provided to be undertaken by Pyramid, Bob Congel, and yourself …. *I look forward to the successful development of this project and a mutually beneficial relationship.*

(Defs.' Ex. RRR.) (emphasis added).

It is clear that Lugosch's decision to proceed with the Congel buy out was induced, at least in part, by Conroy's expressions of encouragement and consent. Although Lugosch may have believed that the 1989 Agreement permitted him to purchase Congel's interest without Conroy's consent, it is unlikely that he would have done so in the manner that he did if Conroy had voiced an objection. In reliance on Conroy's words and deeds, Lugosch pledged his own assets and personally guaranteed the Nomura loan that was used to repay a portion of Congel's advances to the project. In addition, he gave Congel his own promissory note for $9 million in exchange for Congel's partnership interest. The Court accepts Lugosch's testimony that, had he been aware of the claims now made by Conroy, he would not have taken those steps.

It is true that Lugosch never provided Conroy with details regarding either the Congel buy out or the Nomura "financing" until after they had been consummated. However, under these circumstances, the failure to provide such details does not affect the consent given by Conroy. Conroy knew that Lugosch proposed to purchase Congel's interest and consented to the purchase. His consent was not made contingent upon approval of the precise terms of the transaction. Furthermore, the amount to be paid by Lugosch was not a matter of legitimate concern to Conroy. Consequently, the failure to reveal the precise terms of the Congel buy out does not negate Conroy's consent to it. Lugosch's failure to disclose the details of the Nomura "financing" may be a different matter depending upon whether that transaction is characterized as a "financing" or as the

"sale of an equity interest" that impermissibly diluted Conroy's partnership interest. However, it has no bearing on the validity of the Conroy buy out. Accordingly, it is not a proper subject of this proceeding, having been addressed in connection with the Lugosch plaintiffs' motion for partial summary judgment. (*See Lugosch v. Conroy* Memorandum and Order dated November 6, 1997, granting in part and denying in part the Lugosch plaintiffs' motion for partial summary judgment.)

### Conclusions of Law

 Based upon the foregoing facts, the Court hereby reaches the following conclusions of law. The 1989 Agreement prohibited transfers of ownership interests in PPG if the result was that both Lugosch and Congel were no longer in control of the partnership. However, the parties subsequently modified that transfer restriction to permit Lugosch to purchase Congel's general partnership interest. The modification was accomplished by the mutual assent of the parties as manifested by their words and conduct. The consideration received by Conroy was the opportunity that it created to persuade a financial institution to provide the necessary financing for the project and the elimination of a general partner who had lost interest in and lacked commitment to the project. In addition, Conroy's consent is supported by Lugosch's detrimental reliance in pledging his own assets as security for and personally guaranteeing the Nomura loan and in giving Congel a personal promissory note for $9 million in exchange for Congel's interest in PPG. Finally, Lugosch's consummation of the Congel transaction and the various documents evidencing the agreement are sufficient to satisfy the statute of frauds.

 For many of the same reasons, Conroy has waived and is estopped from asserting any right that he may have had to object to the Congel buy out. As already noted, Conroy was well aware of the transfer restrictions contained in the 1989 Agreement. However, despite his numerous conversations and communications with Lugosch, and, even though he knew that Lugosch was making arrangements to purchase Congel's interest,

Conroy never raised any claim that the Congel buy out violated any transfer restrictions or that he objected to the buy out. On the contrary, Conroy encouraged Lugosch thereby further misleading Lugosch into justifiably believing that the transfer restrictions would not be an issue. Moreover, Conroy voluntarily relinquished any right that he may have had to object because he perceived the Congel buy out to be in the best interests of the project in which he had a significant stake. Given that course of conduct, Conroy is estopped from, now, asserting a violation of the 1989 Agreement and he has waived any such right.

### Decision

For all of the foregoing reasons, partial judgment may enter with respect to Count I of the complaint declaring that J. Daniel Lugosch III's purchase of Robert J. Congel's general partnership interest in Providence Place Group did not violate the transfer restrictions, representations and/or warranties contained in the 1989 Agreement, as modified, and that, in any event, the defendants have waived and are estopped from asserting any such violation.

IT IS SO ORDERED,